NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY *vs.* DEPARTMENT OF PUBLIC UTILITIES.

Suffolk.    October 3, 4, 1950. — February 28, 1951.

Present: QUA, C.J., LUMMUS, RONAN, SPALDING, & WILLIAMS, JJ.

*Public Utilities. Telephone Company. Equity Jurisdiction*, Public utilities. *Constitutional Law*, Due process of law, Public utilities. *Equity Pleading and Practice*, Review of order of department of public utilities, Decree. *Words*, "Modify."

A public utility has a constitutional right to judicial review, as by a suit in equity under G. L. (Ter. Ed.) c. 25, § 5, of both the law and the facts on the issue whether a rate established by the department of public utilities is confiscatory.

In the circumstances of a proceeding before the department of public utilities involving the problem of an increase in the rates of a foreign telephone company to enable it to obtain necessary new capital, the ratio of debt capital to total capital was not a matter for the exclusive determination of the management of the company, but might properly be considered by the department; and on the record in a suit in equity under G. L. (Ter. Ed.) c. 25, § 5, it could not be said that the department's adoption of a reduction of the existing debt ratio less than the reduction desired by the company was unlawful.

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

A regulated public utility has a constitutional right to earn a sufficient return to maintain its credit and to obtain additional capital when needed to enable it to serve the public.

Respecting a fixing of rates by the department of public utilities on the "cost of capital" theory in the case of a telephone company at a time when it urgently needed a large amount of new capital to pay temporary loans obtained for the purpose of expanding its plant to meet a vast increase in the public demand for service, and when its costs of operation had increased and its stock was selling substantially below par in the market, a certain percentage of return on stock capital adopted by the department, even if it would be adequate "under normal and representative conditions," was adjudged to be inadequate to enable the company to obtain the necessary new capital under the conditions actually existing and to be confiscatory and unlawful.

In a suit in equity under G. L. (Ter. Ed.) c. 25, § 5, for review of an order by the department of public utilities concerning the rates of a telephone company, this court, while not attempting the nonjudicial task of fixing rates, stated what in its judgment on the evidence before it were the minimum percentages of return on capital and reinvested surplus below which confiscation would result.

Rates fixed for a telephone company must be such as to allow it, among other things, a fair return on surplus reinvested in the business and devoted to the public service.

The word "modify" in G. L. (Ter. Ed.) c. 25, § 5, permits this court in an appropriate case to direct the department of public utilities to eliminate "unlawfulness" in the order under review by changing the order in specified respects definitely stated and capable of being readily followed.

In the circumstances appearing in a suit in equity under G. L. (Ter. Ed.) c. 25, § 5, for review of an order of the department of public utilities respecting rates of a telephone company, this court, having determined that a part of the order was unlawful to the extent that it established rates which would provide returns to the company less than the minimum returns constituting the line of confiscation as drawn and stated by this court on the evidence before it, directed the entry of a final decree containing provisions that the other parts of the order stand and that the unlawful part be modified by the department so that at least such minimum returns would be afforded through detailed schedules to be prepared by the department, and, for the purpose of having rates in force meanwhile, also containing a provision for the retention of the suit in this court and certain other appropriate temporary provisions to be effective until it should be made to appear that the required modification of the department's order had been accomplished, when a supplemental decree was to be entered reciting that fact and declaring the suit to be at an end.

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Suffolk on April 21, 1949.

327 Mass. 81                                         83

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

The suit was reserved and reported by *Wilkins*, J.

*C. C. Cabot & H. P. Moulton*, for the plaintiff.

*H. Freed*, (*J. W. Kelleher & F. J. Quirico* with him,) acting under the direction of the Attorney General, for the defendant.

Qua, C.J.   This is a suit in equity brought by the plaintiff, hereinafter called the company, under G. L. (Ter. Ed.) c. 25, § 5,[1] praying for the annulment of, or other relief from, an order of the department dated March 18, 1949, in a proceeding known as D. P. U. 8181, which disallowed a schedule of rates and charges filed by the company on April 21, 1948, cancelled certain rates previously approved by the department on July 24, 1947, and ordered the company to file on or before April 1, 1949, a new schedule of rates and charges which should be the same as those in effect before July 24, 1947, except for certain specified changes designed to produce approximately the same revenue as the rates of July 24, 1947.   This suit is the same suit in equity to which reference is made in *Department of Public Utilities* v. *New England Telephone & Telegraph Co.* 325 Mass. 281.

## PREVIOUS RATE SCHEDULES.

There had been no increase in the company's rates for many years prior to the approval by the department of the rates of July 24, 1947.   Those rates increased the company's earnings by approximately $5,000,000 and have been known as the $5,000,000 rates.   The rates filed by the company April 21, 1948, and now disallowed by the department would have still further increased the earnings by approximately $10,000,000, making a total increase of $15,000,000.   These have been known as the $15,000,000 rates.   The rates substituted by the department in the order now sought to be annulled preserved the original

---

[1] This statute provides that the Supreme Judicial Court "shall have jurisdiction in equity to review, modify, amend or annul any ruling or order of the commission [department] . . . but only to the extent of the unlawfulness of such ruling or order."

$5,000,000 increase, largely by means of a surcharge of 5% upon customers' bills, and have been called the 5% rates. A further surcharge of 4% allowed after the order now complained of to cover additional labor costs made the so called 9% rates, which are not directly involved in this proceeding except as the 5% rates are included in the 9% rates. The history of these successive rates more fully appears in *Department of Public Utilities* v. *New England Telephone & Telegraph Co.* 325 Mass. 281, at pages 283–286.

### THE STIPULATION, RESERVATION AND REPORT.

When this present suit came on for hearing before the single justice of this court, the company and the department presented a stipulation wherein the company waived all issues except those relating to the adequacy of the return and the rate of return allowed by the department, including as still open the subsidiary issues (a) of adequate return upon stock capital, (b) of a safe ratio of debt capital to total capital, and (c) of the right of the company to earnings upon reinvested surplus. This stipulation included an agreement as to certain facts, among them being that the average 1949 Massachusetts intrastate rate base upon which the company was entitled to a fair return was $238,264,400, if the company was not entitled to earnings upon surplus reinvested in its plant, or $244,185,500, if the company was entitled to such earnings; that the company's total capitalization, not including surplus, was $410,570,100, consisting of long term debt of $135,000,000, advances from the American Telephone and Telegraph Company of $120,000,000, and common stock amounting to $155,570,100, making a ratio of debt capital to total capital of 62.1%; that the surplus was $9,585,000; that the composite cost of existing long term debt was 3.613% as found by the department, which (according to the stipulation and the findings) could be reduced to 3.45%[1] upon the acquisition of new debt

---

[1] This percentage assumes a debt ratio of approximately 45% which the department found to be safe, as hereinafter appears.

327 Mass. 81 . 85

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

capital at slightly lower cost; and that the composite return on the rate base resulting from the department's order would be 4.887%[1] if the company was not entitled to earnings on reinvested surplus and 4.768%[1] if the company was so entitled. Reference will be made to other facts agreed in so far as becomes necessary. It was further agreed that the case should be presented to the single justice upon the pleadings, the facts agreed, and the evidence presented to the department bearing upon rate of return for the determination of the issues "by the court upon its own independent judgment as to both law and fact."

In accordance with the stipulation, all the evidence bearing upon the rate of return, including a transcript of the voluminous testimony and including the exhibits, all of which had been received by the department, was presented to the single justice without additional evidence and, the evidence before him being entirely documentary, the single justice, at the request of the parties, reserved and reported the case for such relief, if any, as might be appropriate under G. L. (Ter. Ed.) c. 25, § 5. See *Boston & Albany Railroad* v. *New York Central Railroad*, 256 Mass. 600, 604–605.

## SCOPE OF JUDICIAL REVIEW.

It is elementary that the fixing of rates is not a proper judicial function. On the other hand, where a rate established by a public regulatory body is attacked as confiscatory the Constitution of this Commonwealth and seemingly still that of the United States require that there be a full opportunity for judicial review as to both fact and law. The cases are collected and discussed in the recent decision of *Lowell Gas Co.* v. *Department of Public Utilities*, 324 Mass. 80, 84–89, certiorari denied sub nomine *Department of Public Utilities* v. *Lowell Gas Co.* 338 U. S. 825. See *St.*

[1] These figures are on the basis of the full year 1949, and do not take into consideration the wage increase with which the department dealt in a separate order (the 9% rates) after the decision from which the present appeal was taken.

*Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, 49–54;
*Federal Power Commission* v. *Natural Gas Pipeline Co.*
315 U. S. 575, 585–586; *Federal Power Commission* v. *Hope
Natural Gas Co.* 320 U. S. 591, 601–602; Robert L. Hale
in 55 Harv. L. Rev. 1116, 1136–1140; 39 Ill. L. Rev. 160,
172–173; Donald S. Carmichael in 40 Mich. L. Rev. 1077,
1083–1084; 51 Yale L. Jour. 1027, 1032. It is the conten-
tion of the company here that the rates set up by the order
of the department of March 18, 1949 (the 5% rates), do
not permit a fair return upon the property of the company
devoted to the public service and are confiscatory. That
issue is before us in all its aspects. It was said, however,
in *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38,
53, that "the court will not interfere with the exercise of
the rate-making power unless confiscation is clearly estab-
lished."

### THE FACTUAL BACKGROUND OF THE CASE.

Certain undisputed facts form the background of the case
and will in large measure determine the outcome. They are
established by a plenitude of figures, charts, and testimony,
but their substance may be stated in simple language. The
company is one of the associated companies of the Bell
system. Of its stock 68.9% is held by the American Tele-
phone and Telegraph Company. During and since World
War II there has been an immense increase in the demand
for the company's telephone service. The company has
greatly increased its facilities but nevertheless by the sum-
mer of 1948 shortly before the hearings began before the
department it had not yet been able to catch up with the
accumulated applications for service. To enable the com-
pany to expand its plant to meet the vast public demand,
and in accordance with a custom in the Bell system, the
American Telephone and Telegraph Company has advanced
to the company on unsecured demand notes at 2.75% the
sum of $120,000,000, which amounts to between a quarter
and a third of the total capitalization of the company. This
money was advanced in the expectation that it would be

repaid in accordance with the custom in the system out of new issues of securities by the company. The company is under an absolute obligation to repay these advances but can do so only by means of acquiring new permanent capital either in the form of additional debt capital through bond issues or in the form of additional stock capital through stock issues. But the experts who testified were in agreement, and we suppose it is matter of common knowledge, that the proportion of debt capital cannot be extended indefinitely without adversely affecting the credit of the company, injuring the market for its stock, and to some degree that for its bonds also. It would seem that the company, with a ratio of 62.1% of debt capital to total capital, is already top heavy with debt, and that a substantial part of the new capital required must be raised by the sale of stock, how much will be a subject of discussion later in this opinion. And at this time, when it has become necessary to raise a substantial amount of new capital through an issue of stock, we are confronted with the further undoubted facts that high costs of operation since the war have greatly impaired the company's earning capacity relative to the capital invested,[1] so that the dividends upon the stock have decreased from 6% to 4.25%, and as the hearing before the department approached its end the stock, of which the par value is $100, had fallen in the market so that it was hovering around $80 to $85. Moreover, the company is a New York corporation and under New York law cannot issue new stock at less than par. N. Y. Stock Corp. Law, § 69. Compare G. L. (Ter. Ed.) c. 166, §§ 7, 8, 9. Such in rough outline was the situation with which the company and the department had to deal. The expert witness called by the Attorney General in behalf of the public conceded that the company was faced with a very serious financial problem to which he could see no answer except in some way to increase earnings.

---

[1] The department finds that, although gross revenues in 1948 exceeded those in 1940 by nearly $51,000,000, the net earnings in 1948 exceeded those in 1940 by only $126,000.

## THEORIES OF RATE MAKING.

The department approached the problem by way of its so called theory of "prudent investment" upon which it and its predecessor commissions have for many years relied in ascertaining the property "actually used or useful for the convenience of the public." See G. L. (Ter. Ed.) c. 159, § 26. As applied to this case the department describes its method in these words, "our method is to ascertain, through appropriate steps, the value of the company's investment in gross intrastate plant in Massachusetts, to deduct therefrom the amount of the company's corresponding depreciation reserve, and to add thereto the amount of working capital, if any, required by the company in its intrastate operations." Application of this method led to the finding of the rate base of $238,264,400, and as hereinbefore stated the parties have now agreed upon this figure, subject to an increase to $244,185,500, if the company is entitled to earnings upon its reinvested surplus.

In determining the fair rate of return upon the rate base the department adopted the "cost of capital" method. As to debt capital this means that the company is entitled to earnings which will pay its actual interest obligations as they accrue on existing debt capital and upon new debt capital required in the immediate future, and as to stock capital, according to a statement of the department in the early part of its decision, it means "the amount which the company would have to pay in order to 'hire' its equity capital under current conditions," subject to the important consequence, which the department apparently recognizes, that commonly a company cannot issue new stock which will have a preferred position over stock already outstanding, and that the rate must therefore be sufficient to pay the same dividends upon all the stock that are required to enable the company to sell new stock.

We pause here long enough to observe that this court has never yet passed upon the soundness of the department's so called "prudent investment" theory of fixing the

rate base or of its corollary the "cost of capital" theory of determining the rate. See, however, *Donham* v. *Public Service Commissioners,* 232 Mass. 309, 313; *Lowell Gas Co.* v. *Department of Public Utilities,* 324 Mass. 80, 94, 95–96. Both theories seem contrary to *Smyth* v. *Ames,* 169 U. S. 466, 546–547,[1] which long dominated judicial thinking, but at least in so far as constitutional limitations are concerned, both theories may be permissible under such more recent decisions as *Federal Power Commission* v. *Natural Gas Pipeline Co.* 315 U. S. 575, 586, *Federal Power Commission* v. *Hope Natural Gas Co.* 320 U. S. 591, 602, and *Colorado Interstate Gas Co.* v. *Federal Power Commission,* 324 U. S. 581, 605. We are not required now to pass upon these theories, since the company has, in general, accepted them as applied by the department and has constructed its evidence before the department in accordance with them. *United Railways & Electric Co. of Baltimore* v. *West,* 280 U. S. 234, 249. We accept them in so far as it is possible to do so for the purposes of this case, but without intending to create a binding precedent for the future.

## COST OF DEBT CAPITAL.

In following the department's theories, no particular difficulty is encountered in ascertaining the probable total cost of debt capital after the acquisition of $120,000,000 of required new capital. We understand the stipulation of the parties and the pleadings to mean that the total cost of debt capital would then be 3.45%,[2] if the debt ratio were reduced to 45%, and would be slightly higher if the debt ratio were reduced to 35%.

## COST OF STOCK CAPITAL. DEBT RATIO.

It is in determining the cost of stock capital that serious difficulty arises. In this connection debt ratio becomes a

---

[1] See *Opinion of the Justices,* 251 Mass. 569, 610; *Horton* v. *Attorney General,* 269 Mass. 503, 509.

[2] The actual finding of the department was 3.448% at a debt ratio of 44.5%.

matter of more importance and has greater effect upon the cost of obtaining new capital. The company contended that in order to restore a sound capital structure it was necessary that enough of the required new capital should be in the form of stock capital to reduce the debt ratio to not more than 35%. The department, while recognizing the necessity of reducing the present debt ratio, was of opinion that a reduction to 45% would be safe. The company further contends that debt ratio is a matter for the exclusive determination of the management of the company. As to this last contention, we agree of course that a public regulatory board cannot assume the management of the company and cannot under the guise of rate making interfere in matters of business detail with the judgment of its officers reached in good faith and within the limits of a reasonable discretion. *State* v. *Public Service Commission of Missouri*, 262 U. S. 276, 288–289. *Banton* v. *Belt Line Railway*, 268 U. S. 413, 421. *New England Telephone & Telegraph Co.* v. *Department of Public Utilities*, 262 Mass. 137, 146. *Havre de Grace & Perryville Bridge Co.* v. *Public Service Commission*, 132 Md. 16, 22–24. But we think that in this instance, in the circumstances now existing and especially in proceeding upon the "cost of capital" theory, the debt ratio is not a matter of that kind. This company is in effect seeking additional capital and higher rates in order to obtain and support such additional capital. Debt ratio substantially affects the manner and cost of obtaining new capital. It seems to us that to say the department could not even consider debt ratio would be to blind its eyes to one of the elements in the problem before it. From the standpoint of the company it might be better to have no debt capital at all. An honest board of directors might think so, and at least from the standpoint of loyalty to the company's interests it would be difficult to say that they had abused their discretion. Yet the evidence shows that such a decision under present conditions might well double or even triple the cost of new capital and increase correspondingly the burden laid upon the public for obtaining it. Surely

the department could give consideration to this matter. There was a great deal of evidence on the point which we cannot undertake to summarize here. It included opinion evidence and comparisons with the debt ratios in other companies, not all of which, it is true, were wholly comparable. It appeared, however, beyond question that under conditions existing at the time of the hearing before the department, owing partly to the tax laws and to the increasing aggregations of capital in the hands of insurance companies and savings institutions, which are restricted in their stock investments, debt capital was very plentiful and cheap, while stock capital was difficult to obtain and comparatively expensive. The department also took into consideration the increased Federal income taxes and the State franchise tax incident to new stock capital. These might well amount to millions of dollars annually and might seriously increase the cost to the public of stock capital compared to that of debt capital. We think that the department could properly consider these additional taxes as elements in the problem before it. *Detroit* v. *Michigan Public Service Commission,* 308 Mich. 706, 715–718. Upon all the evidence, and remembering that the burden of proof is upon the company (G. L. [Ter. Ed.] c. 25, § 5), we are not prepared to say that the refusal of the department to adjust its rates to a reduction in the debt ratio all at once under particularly adverse conditions from the high point of 62.1% to an ideal ratio of 35% or lower and the department's adoption of the figure of 45% were in themselves unlawful or confiscatory.

In reaching this conclusion we have not overlooked the persuasive effect of G. L. (Ter. Ed.) c. 166, § 2, which in substance limits Massachusetts telephone and telegraph companies to a $33\frac{1}{3}\%$ debt ratio. But this statute does not apply to a New York corporation, and its weight as indicating sound policy is greatly weakened by the facts that it was enacted approximately a century ago when the disparity in availability and in cost between debt capital and stock capital could not have been anticipated, and that Massachusetts companies have generally been so few in

number and small in size that there has been little occasion to amend the statute to meet changed conditions.

We are unable, however, to follow the finding of the department that a 6% return on stock capital is adequate. We find no evidence to support the proposition that under the prevailing conditions new stock capital could be had at all unless the rate of return thereon was substantially increased above this figure. Several expert witnesses of undoubted competency testified upon the point most elaborately and after careful study and research. They differed somewhat as to the rate of return on stock capital necessary to sell new stock. The lowest estimate was that of the witness called by the Attorney General in the interest of the public, who testified that 8% would be required at a 45% debt ratio. Estimates of experienced witnesses called by the company, some of them, so far as appears, wholly disinterested, were somewhat higher and were based upon a debt ratio of only 35%. All witnesses agreed that the price of the stock must go substantially above par in the market before an issue of new stock could be sold. At the time this testimony was given the stock was selling substantially below par. Even the witness called in behalf of the public testified in substance that in order to float an issue of new stock the intrinsic worth of the stock ought to approach $120 a share, and that increased earnings were necessary. Indeed, the department itself did not attempt to find in the face of this evidence that new stock capital could be obtained at a 6% return. Its finding was that such return was "fair, reasonable, adequate for the company's needs, and likely under normal and representative conditions to maintain the price of the common stock at or above its par of 100." This may or may not be true, but it does not reach to the real point. The question was not what return might maintain the stock at par in some hoped for representative period. The question was a much more immediate and practical one. Here is one of our greatest and most necessary public utilities. It cannot be permitted to fail in its service to the

public.  It was legally and morally bound to increase its service to meet an insistent public demand.  It did so by borrowing $120,000,000 on demand notes from a source which fortunately was available to it.  It must repay this money in the near future.  It cannot expect to retain this borrowed money indefinitely as part of its capital structure. Its only means of repayment is by obtaining new capital. Concededly it must not increase its debt ratio.  It must therefore sell a substantial amount of stock.  On the evidence it can do this only if it is allowed a return on stock capital substantially larger than the 6% allowed by the department.  On this part of the case we agree with the following two paragraphs taken from the opinion of the dissenting member of the department.

"The fact is, that the investors of New England have apparently lost confidence in these securities.  This is indeed unfortunate, but it is true.  The stock, which is listed in Boston and New York, is currently selling at about 82, and has not been above 90 in a year or more.  The majority has adopted a so-called 'historical basis' of arriving at the cost of equity capital, losing sight of the fact that this company is going to be compelled to float new issues, not in the period of from 1938 to 1946, and certainly not in 1925, but now and on the present market.  No witness anywhere in the record, including the Commonwealth's own witness, Whiteside, testified that the company could acquire new equity capital at less than 8 per cent. . . .

"The company has been receiving revenues under an emergency rate increase since July, 1947, of about $5,000,000 in excess of its prior '1946' rates.  We are now informed that this emergency increase is to be cancelled but that, on the other hand, an increase of almost exactly the same amount over the prior '1946' rates will restore the company's earnings to the point where its stock will go up some twenty points on the market.  I feel this is a peculiar logic and one which is lacking in realism.  Neither my own observations nor the testimony before us cause me to believe that any such result will follow."

It is repeatedly stated or implied in the decided cases, so far as we know without contradiction, that one of the constitutional rights of a regulated utility is the right to earn a sufficient return to maintain its credit and to obtain additional capital when needed to enable it to serve its public. *Bluefield Water Works & Improvement Co.* v. *Public Service Commission of West Virginia,* 262 U. S. 679, 693. *State* v. *Public Service Commission of Missouri,* 262 U. S. 276, 291 (Brandeis and Holmes, JJ.). *Federal Power Commission* v. *Hope Natural Gas Co.* 320 U. S. 591, 603. *Colorado Interstate Gas Co.* v. *Federal Power Commission,* 324 U. S. 581, 605. See *Fall River Gas Works Co.* v. *Gas & Electric Light Commissioners,* 214 Mass. 529, 538; *Lowell Gas Co.* v. *Department of Public Utilities,* 324 Mass. 80, 97; *United Railways & Electric Co. of Baltimore* v. *West,* 280 U. S. 234, 249. It is sometimes added that earnings should be sufficient to enable something to be passed to surplus, *Id.* at page 252. *Wabash Valley Electric Co.* v. *Young,* 287 U. S. 488, 501. *Alabama Public Service Commission* v. *Southern Bell Telephone & Telegraph Co.* 253 Ala. 1, 19–21. See *Petition of New England Telephone & Telegraph Co.* 115 Vt. 494, 513; *Application of Northwestern Bell Telephone Co.* 69 S. D. 36, 47–48. The department made no provision for surplus. If the "cost of capital" theory on which the department purported to proceed requires the cost of stock capital to be ascertained by reference to some supposedly normal period and in disregard of the stubborn facts existing in the period when the capital must be raised, instead of by reference to "the amount which the company would have to pay in order to 'hire' its equity capital under current conditions" as stated in the department's own definition of that theory, the theory must give way to the extent necessary to afford the utility its constitutional rights. Stated in a different way, if rates are to be fixed on a "cost of capital" theory so that a return of only 3.45% is allowed on debt capital, the theory must be consistently applied, and a sufficient return must be allowed on stock capital so that in fact necessary stock capital can be acquired. We do not see that the situ-

327 Mass. 81                                              95

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

ation is materially altered by the hope or even expectation that the American company will take the full 68.9% to which it is entitled out of any new stock issue. It is not bound to take any and might not do so. Moreover, if it took its full share, the necessity for selling a large block to the general public would still exist. For the reasons above set forth, we are forced to conclude that the allowance of only a 6% return on stock capital, where less than 3½% has been allowed on debt capital, and the resulting overall return on both kinds of capital is only 4.887%, if surplus is not entitled to earnings, and 4.768% if surplus is entitled to earnings, was confiscatory and unlawful. It seems proper to add that if we turn away from the method and consider only the result reached, an examination of the decisions of regulatory boards and of courts convinces us that an overall return of approximately 4.8% on the rate base is considerably below that which is reasonably expected and is generally being allowed on the capital of public utilities used and useful in the public service.

Although it is beyond our power to fix rates and we certainly have no desire to attempt that task, yet it is our duty to draw to the best of our ability the line where confiscation begins, and in the circumstances of this case, in order to make our decision as useful as possible and not merely the starting point of a series of attempts to ascertain by the method of trial and error just what figure this court would allow to stand, it seems that we should state where in our judgment on the evidence before us that line must be drawn. The Supreme Court of the United States did this in *United Railways & Electric Co. of Baltimore* v. *West*, 280 U. S. 234, 252. As previously stated, there is no dispute as to the cost of debt capital. But on all the evidence, and we have nothing else to go by, it is our opinion that a return of nothing less than 8.5% will suffice to attract new stock capital at a debt ratio of 45% and to enable the company to restore its credit and properly to capitalize its new construction. This is somewhat less than the company asserted and introduced evidence to prove that it must have and is only one half of

one per cent more than the expert witness called by the Attorney General testified to be necessary. It should produce an overall composite net return on all capital devoted to the public service (disregarding for the moment surplus reinvested in the business) of 6.23%, as appears below:

45% debt  capital x 3.45% net return = 1.55% net return on whole capital
55% stock capital x 8.5%  net return = 4.68% net return on whole capital

Composite net return on total of both
    kinds of capital    .    .    .    6.23%

In our opinion therefore a net return of less than 8.5% on stock capital or less than 6.23% on the sum of both kinds of capital is below the level where confiscation begins. It does not follow that a considerably higher return might not fall within the range of reason and might not have been allowed by the department, but our duty is performed by marking the line of confiscation.

### RETURN ON REINVESTED SURPLUS.

But we are of opinion that the company is entitled to a fair return on its surplus which it has reinvested in its business and thus devoted to the public service. This money belongs to the company and not to its customers. The money could have been paid out in dividends to the stockholders. Instead, it has been put into the plant for the benefit of the public, thus obviating the necessity of acquiring capital in some other manner upon which the company would have been entitled to a fair return. We are not impressed by the argument that this surplus must have been wrongfully exacted from past customers through excessively high rates and so should now be devoted to the public service without compensation. Apart from the obvious impossibility of restoring the money to a past generation of customers, there is not a scintilla of evidence that the money was wrongfully exacted in the first place. As hereinbefore stated good authority supports the proposition that a public utility has a constitutional right to a sufficient return to enable it to accumulate a reasonable surplus. There is no

reason to doubt that the rates of the company in past years have been fair and in accordance with the filed schedules which it was obliged to observe and which could have been reduced by the department or its predecessor commission if they were excessive. The allowance of a fair return on reinvested surplus is not the same as a stock dividend, which is forbidden to Massachusetts telephone companies by G. L. (Ter. Ed.) c. 166, §§ 9, 10. The question of the company's right to a fair return on surplus devoted to the public service so long as it remains so devoted is practically settled by what was said in *Fall River Gas Works Co.* v. *Gas & Electric Light Commissioners*, 214 Mass. 529, at pages 538–539, and by what was said in *Attorney General* v. *Trustees of Boston Elevated Railway*, 319 Mass. 642, at pages 660–661. And see *Lowell Gas Co.* v. *Department of Public Utilities*, 324 Mass. 80, 96, note. Our views are supported by the substantial weight of authority elsewhere. *Public Utility Commissioners* v. *New York Telephone Co.* 271 U. S. 23, 31–32. *Garden City* v. *Garden City Telephone, Light & Manuf. Co.* 236 Fed. 693, 696–697. *Minneapolis* v. *Rand*, 285 Fed. 818, 822–823. *Monroe Gaslight & Fuel Co.* v. *Michigan Public Utilities Commission*, 292 Fed. 139, 147. *United States* v. *Public Utilities Commission of District of Columbia*, 158 Fed. (2d) 533, 537. *Grafton County Electric Light & Power Co.* v. *State*, 77 N. H. 539, 542. *Boonville* v. *Maltbie*, 245 App. Div. (N. Y.) 468, 473–474, affirmed, 272 N. Y. 40. *Brymer* v. *Butler Water Co.* 179 Pa. 231, 251. *Erie City* v. *Public Service Commission*, 278 Pa. 512, 523–524.

This brings us at once to the question as to what rate of return the company is entitled to receive on reinvested surplus, which is neither debt capital nor stock capital, but has been derived from both kinds of capital. In a case tried, as this case has been, on the theory of "cost of capital" it seems to us that the line of confiscation in the return on reinvested surplus is the same as that established for the composite return on debt and stock capital, to wit, 6.23%, and that a lower rate of return would be confiscatory, and we so hold.

### METHODS OF DISPOSING OF THE CASE.

Upon the foregoing conclusions serious questions arise as to the proper disposition of the case. According to the statute under which the case is before us we have "jurisdiction in equity to review, modify, amend or annul any ruling or order of the commission [department] . . . but only to the extent of the unlawfulness of such ruling or order." Obviously it was the intent of the Legislature, and it is our duty, to preserve the order of the department to the extent that it is possible to do so without violation of law. The order of March 18, 1949, to which this suit relates, was in three parts.[1] The first part disallowed the company's $15,000,000 rates. Taken by itself, there was nothing unlawful in this, since those rates were considerably above the level of confiscation, and so the department was not obliged as matter of law to allow them. Whether they might properly have been allowed is not for us to say. This part of the order should be preserved if possible. The second part of the order cancelled the $5,000,000 rates authorized by the department July 24, 1947. Taken by itself, there seems to have been nothing unlawful in this, since these rates were below the confiscation level, and so ought not to stand. This part of the order should be preserved if possible. The third part of the order set up the 5% rates, which are confiscatory and cannot stand. This is the focal point of the difficulty. If this part of the order is simply annulled, while the first and second parts stand, either the company will be left without any rates, which is inadmissible (G. L. [Ter. Ed.] c. 159, § 19; *Department of Public Utilities* v. *New England Telephone & Telegraph Co.* 325 Mass. 281, 284), or the rates will automatically become either those which were in effect before the $5,000,000 rates, which would be highly confiscatory, or the 9% rates which are also confiscatory, since they are merely the 5% rates

---

[1] We are leaving out of consideration incidental parts of the order relating to termination of the investigation and similar matters.

plus an additional 4% to cover an additional labor charge incurred after the filing of the $15,000,000 rates, which additional charge was not provided for in the 5% rates allowed by the department. It is not necessary now to determine which of the last mentioned alternatives would be the correct one. On the other hand, if in order to avoid any of these results the first part of the order is annulled the consequence will be to leave the $15,000,000 rates in effect and to allow the company to keep the benefit of rates disapproved by the department and substantially higher than the confiscatory level from March 18, 1949, until such time as new nonconfiscatory rates can be ordered and put into effect. This seems an unfortunate result, since it might lead utility companies to file extravagantly high rates in the hope that even if the department disallowed them it might substitute rates so low that this court would hold them confiscatory, and the company would then get the benefit of its own high rates, perhaps for a considerable period of time. It is evident that much time is required to prepare, present, and decide one of these rate cases, even with the best efforts of counsel and the court.

If the words of G. L. (Ter. Ed.) c. 25, § 5, "The supreme judicial court shall have jurisdiction in equity to review, modify, amend or annul any ruling or order of the commission [department] . . . but only to the extent of the unlawfulness of such ruling or order" are to be interpreted narrowly and literally, and if the word "modify" refers only to such verbal changes in the order as this court can itself make in express words, there would seem to be no means of escape from one or another of the undesirable consequences enumerated above, which it is difficult to suppose the Legislature intended to leave possible. If, however, the word "modify" includes in a proper instance a direction to the department to change its order in certain specified respects definitely stated and capable of being readily followed so as to eliminate all illegality, those consequences can be avoided, and the interference of the court with the action of the department can be strictly

confined "to the extent of the unlawfulness of such ruling or order." Where the "unlawfulness" consists in confiscation the "extent of the unlawfulness" would seem to be measured by the degree of confiscation. We have already sufficiently indicated what degree of confiscation was involved in the department's order of March 18, 1949. We cannot ourselves correct the order by amendments which would cure the difficulty, because we are not in a position to determine which schedules would best be changed and in what amounts to produce the necessary result. Moreover, any attempt on our part to do this would lead us into the forbidden area of rate making. *American Employers' Ins. Co. v. Commissioner of Insurance,* 298 Mass. 161, 169–170. Compare *Janvrin, petitioner,* 174 Mass. 514. The department, however, is equipped and competent to make the changes which we can easily define in general terms. We believe that the statute should be construed broadly enough to permit us to "modify" the order by giving appropriate directions to the department for such changes as will render the order lawful in all its parts. The department in effect requests us to do this in its brief. The word "modify" lends itself to this construction. The word "amend" seems more appropriate to such verbal changes as we ourselves may write into the order. Both words are used in the statute. It is hardly likely that they were both used in exactly the same sense. It has long been a well known practice of this court in equity cases to "modify" a decree of a lower court by giving directions as to what should be done, even where it may be necessary to make further findings. Possibly this court had something of this sort in mind when in suits in equity brought against this same department under this same section the court said, "The determination of this matter called for the exercise of sound judgment, and it cannot be said that the department erred as matter of law. *No sufficient reason appears for sending the case back for further hearing upon this question*" (emphasis supplied). *Boston & Albany Railroad v. New York Central Railroad,*

256 Mass. 600, 611. By the adoption of this method the final order of the department made pursuant to this decision will still be the order of March 18, 1949, as modified, and will govern the rates from that date. The rates fixed in the order as modified in accordance with the decree of this court and in effect confirmed by the supplemental decree hereinafter mentioned, will be the sums "determined to have been legally collectible" within the meaning of the condition of the bond given by the company to protect its customers against overcharge in the event that the order of March 18, 1949, should ultimately be "determined to have been valid in whole or in part."

We are hopeful that by the interpretation we have placed upon G. L. (Ter. Ed.) c. 25, § 5, that statute will prove an efficient means through which this court can perform the duty laid upon it without leaving the department and the utilities in doubt as to what is deemed confiscatory, and so without the necessity of repeated suits. This course could not have been taken in *Lowell Gas Co.* v. *Department of Public Utilities*, 324 Mass. 80, because of the lack of necessary detail in the decision of the department.

## Effect of this Decision upon the 9% Rates.

A word should be said about the 9% rates which are not directly involved in this proceeding. These rates were ordered by the department on May 13, 1949, to cover additional labor costs incurred by the company after it had filed the $15,000,000 rates on April 21, 1948, and because the department did not allow anything for the additional labor item in its decision upon those rates of March 18, 1949. *Department of Public Utilities* v. *New England Telephone & Telegraph Co.* 325 Mass. 281, 285–286. In that case we held that the company had a right to a decision of the court upon its proposed $15,000,000 rates, and that all subsequent rate orders and rates were subject to such decision as this court should make on the $15,000,000 rates. 325 Mass. at pages 291–292. So now, when this decision of the court on those rates modifies the order of the department of March

18, 1949, the rates contained in that order as modified by this decision supersede all rates subsequent to the filing of the $15,000,000 rates, including the 9% rates. But the department has recognized the necessity of providing for the increased labor cost which the company has been paying for a period beginning before the order of March 18, 1949. It follows that in calculating the rates required to produce a net return of 8.5% on stock capital at a 45% debt ratio it will be necessary to include these increased labor costs as operating expenses.

## CONCLUSION.

The result is that the first part of the order of the department of March 18, 1949, disallowing the $15,000,000 rates is to stand; that the second part of the order cancelling the $5,000,000 rates is to stand; but that the third part of the order setting up the 5% rates is to be so modified as to provide for a net return of at least 8.5% on stock capital and 6.23% on reinvested surplus, the department to determine the detailed schedules required to produce that result, and in so doing to include the increased labor cost in operating expenses. A final decree to that effect is to be entered by the single justice. In order, however, that there may be rates in force while the modified schedules are being prepared, the decree shall provide that this suit be retained in this court; that that part of the decree which sustains the department in disallowing the $15,000,000 rates shall not become effective; and that the interlocutory decrees of May 23, 1949, and May 25, 1949, staying respectively the enforcement of the department's order of March 18, 1949, relative to the $15,000,000 rates and its order of May 13, 1949, relative to the 9% rates be continued in effect, so that the company can continue to charge the $15,000,000 rates subject to the bond — all until it shall be made to appear to the court that the department's 5% rates have been modified as required by the decree, when a supplemental decree shall be entered, reciting that fact and declaring this suit at an end.

*So ordered.*