DAVID T. ZUSSMAN, trustee, *vs*. RENT CONTROL
BOARD OF BROOKLINE & others.[1]

Norfolk.    April 14, 1975. — March 11, 1976.

Present: HALE, C.J., GRANT, & ARMSTRONG, JJ.

*Rent Control. Brookline. Municipal Corporations,* Rent control. *Jurisdiction, Civil,* Review of action of rent control board. *Administrative Board. Constitutional Law,* Rent control.

In an appeal under G. L. c. 231, § 97, from a decision of a rent control board, the judge was warranted in finding that the 6.8% rate of return allowed on the plaintiff's rental units by the board was confiscatory, but he erred in substituting his own determination of a reasonable rate of return; the judge was required by the provisions of St. 1970, c. 842, § 7, to remand the case to the board to set a reasonable rate once he had made a finding as to the minimum rate permissible to avoid confiscation. [142-144]

COMPLAINT filed in the Municipal Court of Brookline on October 4, 1973.

On appeal to the Superior Court, the case was heard by *Mitchell, J.*

*Robert J. Muldoon, Jr. (Earl Auerbach & Birge Albright* with him) for Earl Auerbach & others.

*Arthur M. Gilman (William F. York* with him) for the plaintiff.

---

[1] Various tenants of Zussman.

GRANT, J. The plaintiff, as trustee, is the owner of an apartment complex in Brookline which he is in the process of converting from rental units to condominiums. See *Zussman* v. *Rent Control Bd. of Brookline,* 367 Mass. 561 (1975). On or about May 21, 1973, the plaintiff, acting under the provisions of St. 1970, c. 842, § 8 (a),[2] filed a petition with the Rent Control Board of Brookline (board) for upward adjustments of the maximum rents then applicable to the 26 units of the complex which were still held for rental purposes at that time. On September 4, 1973, the board, following a public hearing on the petition, rendered a decision allowing the plaintiff certain rent increases which were considerably less than what he had requested. In arriving at its decision the board allowed the plaintiff a rate of return of 6.8% on what the board determined to be the total value of the 26 units during the roll back month.[3] See c. 842, § 6 (a).

The plaintiff, acting under c. 842, § 10 (a), sought judicial review of the board's decision by filing a complaint against the board and the tenants of the units in question in the Municipal Court of Brookline, which affirmed the decision of the board. The plaintiff thereupon appealed to the Superior Court under G. L. c. 231, § 97. See *Gentile* v. *Rent Control Bd. of Somerville,* 365 Mass. 343, 346, n. 3 (1974).

A judge of the Superior Court, following an evidentiary hearing, found that "a reasonable return on the fair value of . . . [the plaintiff's] property is 10% and that the 6.1%

[2] The provisions of c. 842 were accepted by the town of Brookline on September 29, 1970. See *Marshal House, Inc.* v. *Rent Control Bd. of Brookline,* 358 Mass. 686, 690 (1971); *Sherman* v. *Rent Control Bd. of Brookline,* 367 Mass. 1, 2 (1975). The termination date of c. 842 has been extended (by St. 1975, c. 851, § 1) to April 1, 1976.

[3] The board found that the plaintiff had failed to perform ordinary repair and maintenance and for that reason disallowed a portion of the total rent increase which it would otherwise have granted to the plaintiff. See c. 842, § 7(b)(6). That disallowance, which is not challenged per se, resulted in reducing the 6.8% rate to an effective rate of 6.1% on the total value of the rental units as determined by the board.

return allowed[4] does not yield ... [the plaintiff] a fair
net operating income." He ruled that the 6.1% return "is
confiscatory especially when considered in light of the
large interest factor with which ... [the plaintiff] is faced
and which has in no degree been considered as a cost factor
by the [b]oard in determining fair net operating income
in this case." Judgment was entered remanding the case to
the board to recompute the rents of the various units on
the basis of a 10% return on the total value thereof as de-
termined by the board, and to submit to the court a sched-
ule showing the resulting amounts of the monthly rent
increases proposed for each of the particular units. The ten-
ants appealed to this court.[5] No question has been raised
as to whether the case is properly here.

Following the entry of that judgment and the filing of
the tenants' brief in this court it was held by the Supreme
Judicial Court that "the court's proper role [in cases
brought under St. 1970, c. 842, § 10] is not to take evidence
afresh and decide for itself what rent is to be fixed, but is
rather to decide whether the board's decision was sup-
ported by the facts before it and was legally justified."
*Sherman* v. *Rent Control Bd. of Brookline*, 367 Mass. 1, 10
(1975). It was apparent from a study of the transcript
of the proceedings before the Superior Court that the
judge had assumed a different role in this case and that
the above quoted finding and ruling had resulted from the
judge's having substituted his judgment for that of the
board as to the proper rate of return which should be al-
lowed to the plaintiff on the total value of the rental units
as determined by the board.[6]

---

[4] See note 3, *supra.*

[5] The board also filed a claim of appeal, but it has filed no brief in
this court.

[6] For instance, when the plaintiff objected to the tenants' offering in
evidence the transcript of the hearing before the board, the judge said,
"I thought this was a hearing de novo for a determination to be made
by me. What difference does it make what they said at that other hear-
ing?" Despite this remark, the transcript was admitted in evidence.

We ourselves could have conducted the type of review contemplated by the *Sherman* case but for one additional problem which was not present or considered in that case. That was whether the board had selected a rate of return on the value of the rental units which was so low as to result in confiscation of the plaintiff's property in a constitutional sense.[7] We were (and still are) of the opinion that that problem is one which cuts across the normal scope of judicial review in rent control cases as delineated in the *Sherman* case because the plaintiff was (and is) constitutionally entitled to judicial review of both the facts and the law with respect to his claim that the rate of return set by the board has resulted in confiscation of his property. See *Marshal House, Inc.* v. *Rent Control Bd. of Brookline,* 358 Mass. 686, 706 (1971). See, generally, *Opinion of the Justices,* 251 Mass. 569, 610-611 (1925); *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 327 Mass. 81, 85-86 (1951); *Opinion of the Justices,* 328 Mass. 679, 685-690 (1952); *Aetna Cas. & Sur. Co.* v. *Commissioner of Ins.* 358 Mass. 272, 277-278, 280-281 (1970); *G & M Employment Serv. Inc.* v. *Commonwealth,* 358 Mass. 430, 437-443 (1970), app. dism. sub nom. *G & M Employment Serv. Inc.* v. *Department of Labor & Indus.* 402 U. S. 968 (1971); *Boston Gas. Co.* v. *Department of Pub. Util.* 368 Mass. 51, 54; *S. C.* 368 Mass. 780, 789-790 (1975). The plaintiff had (and has) the burden of proof on that issue under the *Marshal House* case (358 Mass. at 706), but it seemed quite likely that the parties would have offered different evidence in the Superior Court and that the judge would have acted differently if all concerned had understood that the judge could not simply hear relevant evidence and then substitute himself for the board in the statutory framework.

Accordingly, we remanded the case to the Superior

---

[7] At no time has the plaintiff advanced any serious argument before us that the board erred in determining the value of the rental units (at $461,285) or the actual operating and maintenance expenses thereof. The plaintiff has expressly disavowed any attempt to include depreciation in operating expenses.

Court "for further proceedings in the light of ... the scope of judicial review delineated in [the] *Sherman* [case] ... and ... the further principle that the ... [plaintiff] has a constitutional right to judicial review of both the facts and the law with respect to ... [his] claim ... that the decision of the ... board ... result[s] in confiscation of his property."[8] The order required the Superior Court (if the plaintiff should continue to press the constitutional point) to "(a) conduct an evidentiary hearing at which all parties shall be given an opportunity to introduce all relevant evidence, (b) make its own independent findings on such evidence, and (c) state separately its conclusions of law thereon." The court was also to "reconsider ... [its] original] judgment ... and ... amend the same in the respects (if any) which it [should] determine to be required by ... [its] findings and conclusions" on the constitutional point. Following the remand the parties appeared before the same judge. The plaintiff waived the opportunity to offer further evidence, and the parties stipulated that the further review and reconsideration should be based on the record already before the court.[9]

It appeared (from either or both the testimony before the board and the testimony before the court), and the judge has now found (without objection), that the plaintiff purchased the entire apartment complex in 1972 (two years following the advent of rent control) for a total price of $700,000, with the intention of converting it to condominiums; that the plaintiff financed the purchase with a $700,000 mortgage at an interest rate of about 9%; and that 26 units of the complex were still held for rental pur-

---

[8] This portion of the order specifically cited all the cases on the constitutional problem which we have cited in our opinion except the *Boston Gas* case, which had not then been decided.

[9] That record consists of the transcript of the public hearing, certain reports submitted to the board by members of its staff following the conclusion of the hearing, the relevant rent control regulations adopted by the board (see c. 842, § 5 [c]-[e]), the decision of the board (including its underlying calculations and subsidiary findings), and testimony offered by the parties in the Superior Court.

poses at the time of the plaintiff's petition to the board. There was uncontradicted expert testimony for the plaintiff, both before the board and in court, to the effect that 10% should be considered as a fair, conservative and reasonable rate of return on the property in question as of the time of the plaintiff's petition. It appeared from the in-court testimony of the "director-counsel" of the board that the board had not considered the cost of the plaintiff's financing in arriving at the 6.8% rate of return allowed by the board in its decision.[10] It appeared from the face of the decision and from the in-court testimony of the chairman of the board that the 6.8% had not been determined on the basis of any evidence at the hearing before the board but had been arbitrarily taken from the board's "original decision on this property" on a date some seven months prior to the plaintiff's purchase of the property and some fifteen months prior to the date of the present petition.[11]

The judge, acting this time in accordance with the principles illuminated in the *Sherman* case, sustained the decision of the board in every respect except the rate of return allowed on the value assigned to the rental units. The judge found that "in 1973 a conservative figure for financing property such as . . . [the plaintiff's was] seventy percent of its market value and that the interest rates for mortgages on such properties in 1973 was 9%." He again

---

[10] This was probably in accordance with the literal requirements of the board's regulations. Section 10 of the regulations ("STANDARDS FOR RENT ADJUSTMENT") contains a rebuttable presumption that the rents in effect during the roll back month yielded a "fair net operating income." It directs the board, in cases of applications for upward adjustments of maximum rents, to consider each of the six "factors" set out in c. 842, § 7(b). It departs from § 7(b) in the respect that it contains no reference to "other relevant factors." Under the regulations the "debt service rate" (as defined) assumes relevance only in cases of downward adjustments of the rents in effect during the roll back month.

[11] The record is silent as to the basis for the original determination of 6.8% and as to the date to which it related. For all that appears, the petition which resulted in the original decision could have been filed shortly after the acceptance of c. 842 in 1970.

found that "a reasonable return on the fair value of . . . [the] property is 10% and that the 6.1% return allowed does not yield . . . a fair net operating income." Substantially as before, the judge ruled that a "6.1% return on the fair market value of . . . [the] property as determined by the [b]oard is confiscatory because it does not yield a reasonable return on the fair market value of the landlord's investment . . . especially when considered in light of the large interest factor with which . . . [the plaintiff] is faced and which has in no degree been considered as a cost factor by the [b]oard in determining fair net operating income in this case."[12] By the ensuing amended judgment the board was again ordered to recompute the aggregate of the rents of the various units on the basis of a "fair net operating return" of 10% on the value of those units as determined by the board (retroactive to the date of the board's decision), and to submit to the court a further schedule showing the resulting amounts of the monthly rent increases proposed for each of the several units. The case has now been returned to us, and further briefs have been received and considered.

It is clear from the *Marshal House* case that when a rent control board proceeds to determine the "fair net operating income" (c. 842, § 7) of a "controlled rental unit" (c. 842, § 3[b]) it is constitutionally required to set a rate of return which will assure to the landlord a "reasonable return" on the value of his property and that this is so whether the board proceeds directly under c. 842, § 7, or indirectly under some form of regulation adopted pursuant to the authority granted by c. 842, § 5 (358 Mass. at 702-706). Although a board may, in the absence of any "capital improvement of the housing unit" (c. 842, § 7[b][3]), or any "substantial deterioration . . . other than as a result of ordinary wear and tear" (c. 842, § 7[b][5]), stabilize the value of the landlord's property as of a roll back date, it

---

[12] For the reasons stated in note 3, *supra,* the 6.1% referred to by the judge must be taken to mean the 6.8% employed in the basic decision of the board.

must recognize that the concept of "reasonable return" (358 Mass. at 703, 705-706) is not a static one and that what is "reasonable" at one time may be unreasonable under the differing economic conditions of another time. ·

We think the foregoing principles are reflected in the findings and rulings made by the judge following the remand in this case. On the evidence, the 6.8% return employed by the board in its basic decision (n. 12) bore no relationship to the economic conditions prevailing at the time of the plaintiff's petition for rent adjustments (see n. 11). The plaintiff's evidence concerning the reasonableness of a 10% rate of return on the value of the property in question clearly warranted the judge's findings that that rate reflected a "reasonable return" and that the rate allowed by the board "does not yield . . . a fair net operating income." Those findings are not "clearly erroneous" within the meaning of Mass.R.Civ.P. 52 (a), 365 Mass. 816 (1974). See Marlow v. New Bedford, 369 Mass. 501, 508 (1976). In our opinion, the disparity between the 10% and the 6.8% explains and justifies the judge's ruling that the 6.8% was "confiscatory because it does not yield a reasonable return on the fair value of the" plaintiff's property as determined by the board. It follows that there must be an upward adjustment of the rate of return allowed by the board.

However, it does not necessarily follow that the plaintiff is constitutionally entitled to the 10% rate of return which the judge found to be reasonable in the circumstances. Rate making is essentially a legislative or administrative function, not a judicial one. As was clearly recognized in the Sherman case, c. 842, § 7, endows a rent control board with "substantial discretion . . . in deciding on the evidence what rent adjustments are to be allowed" (367 Mass. at 8). In a case such as the present a court can go no further than an expression of its judgment, based on the evidence before it, as to where the line of confiscation must be drawn. See and compare New England Tel. & Tel. Co. v. Department of Pub. Util. 327 Mass. 81, 85-86, 95-96 (1951). The practical and legal difficulty in the present

case is that there was no evidence before the court, either before or after the remand, which would have warranted a finding or ruling as to where the line should be drawn between confiscation and what would be constitutionally permissible.[13] That a 10% rate of return might be "reasonable" in the constitutional sense (see the *Marshal House* case, 358 Mass. at 703, 704-705) does not necessarily mean that a somewhat lower rate would be "unreasonable" in the same sense.

We have concluded, with some reluctance in view of the lengthy delays already encountered, that this case must again be remanded to the Superior Court for the taking of further evidence which will permit the court to undertake a meaningful exercise of judgment as to where the line of confiscation lies. The court is to determine, on the basis of all the evidence then before it, the minimum rate of return (somewhere in the range between 6.8% and 10%) which would reasonably have been expected by a hypothetical purchaser of the 26 rental units who would have been willing to purchase them on the date of the plaintiff's petition to the board for a price equal to the value of those units as already determined by the board. Once that minimum rate of return has been so determined, the case is to be remanded to the board for (a) a further determination by it (under c. 842, § 7, and § 10 of the rent control regulation) of a proper "fair net operating income" at least equal to the minimum rate determined by the court and (b) determinations as to how the resulting aggregate increase in the maximum rents for all the units is to be allocated to the several units, retroactive to the date of the board's original decision.[14] See and compare the *New England Telephone*

---

[13] The *New England Telephone* case was specifically cited in our original order of remand (see note 8, *supra*), and we can only conclude that its significance appears to have escaped all concerned.

[14] To answer a question argued by the tenants in their original brief (but not in their second brief), we see no reason why any judgment of the court on this point should not relate back to the date of the board's decision in this case. Indeed, § 8(a) of the board's own regulations would have permitted the board to compute a monthly "surcharge" for

case (327 Mass. at 95-96, 98-101). The court is to retain jurisdiction over the further proceedings before the board.

The amended judgment entered in the Superior Court on July 31, 1975, is reversed, and the case is remanded for the further proceedings required by this opinion. Costs of appeal are not to be awarded to any party.

*So ordered.*

---

each rental unit retroactive to the original filing date of the plaintiff's petition to the board. On the other hand, the tenants are free to move for a dismissal of the present proceedings if the plaintiff fails to prosecute them with all due diligence in the circumstances. See Mass. R.Civ.P. 41(b)(2), 365 Mass. 804 (1974).