NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY *vs.* DEPARTMENT OF PUBLIC UTILITIES.

Suffolk. April 5, 1954. — September 20, 1954.

Present: QUA, C.J., RONAN, WILKINS, SPALDING, & COUNIHAN, JJ.

*Public Utilities. Telephone Company. Constitutional Law,* Due process of law, Public utilities. *Equity Pleading and Practice,* Review of order of department of public utilities. *Law or Fact.*

In rate regulation of a public utility, the Constitution of Massachusetts does not compel the use of any particular theory or method or combination of theories or methods in determining the rate base. [616]

Upon an appeal to this court under G. L. (Ter. Ed.) c. 25, § 5, as appearing in St. 1953, c. 575, § 1, to review an order by the department of public utilities respecting rates of a telephone company, the record did not clearly establish that in the circumstances of the case confiscation of the company's property would result from use by the department of the "prudent investment" theory rather than the "fair value" theory in determining the rate base. [617]

On the record of an appeal to this court under G. L. (Ter. Ed.) c. 25, § 5, as appearing in St. 1953, c. 575, § 1, it could not be said that in determining the rates of a telephone company the adoption by the department of public utilities of an assumed debt ratio founded on a "full recognition of the interest of the rate payers" in the company's capital structure was unlawful or confiscatory although such assumed debt ratio was substantially higher than the company's actual debt ratio. [618]

Upon an appeal to this court under G. L. (Ter. Ed.) c. 25, § 5, as appearing in St. 1953, c. 575, § 1, to review an order by the department of public utilities, the question whether a finding made by the department was warranted by the evidence is a question of law. [620]

On the record of a case concerning the rates of a telephone company, it was an error of law on the part of the department of public utilities to disallow as an operating expense of the company for a certain year one

half of so called "freezing payments," made that year by the company into an irrevocable pension trust fund to insure the integrity of the pension plan, on the ground that the disallowed payments "should have been charged against operations in previous years"; the full amount of the payments should be allowed as operating expense for the year in question. [621]

This court recommitted a case concerning the rates of a telephone company to the department of public utilities to review its findings where nearly a year had elapsed since the department's original decision and nearly nine months had elapsed since a supplemental decision substantially increasing the rates originally allowed, and it appeared likely that in a period of rising costs the company would not earn a fair net return even on the basis of the increased rates allowed. [623–624]

PETITION for appeal, filed in the Supreme Judicial Court for the county of Suffolk on October 23, 1953.

The case was reserved and reported by *Wilkins*, J., without decision.

*Charles C. Cabot*, (*John M. Gepson, Charles Ryan, Robert H. Montgomery, & William M. Hogan, Jr.*, with him,) for the plaintiff.

*Matthew S. Heaphy*, Assistant Attorney General, *& Edward N. Gadsby*, (*Jason A. Aisner*, Assistant Attorney General, with them,) for the defendant.

WILKINS, J. This appeal by the company under G. L. (Ter. Ed.) c. 25, § 5, as appearing in St. 1953, c. 575, § 1, is to review orders of the department entered on September 30, 1953, and later amended,[1] which disallowed rates and charges filed by the company on December 10, 1952, to take effect on January 10, 1953, and April 1, 1953, and ordered the filing of new schedules.

The disallowed rates were designed to increase current earnings by $10,225,000. As in *Department of Public Utilities* v. *New England Telephone & Telegraph Co.* 325 Mass. 281, 283–284, the department suspended the application of the proposed rates for ten months, the maximum period permissible. G. L. (Ter. Ed.) c. 159, § 20, as amended by St. 1939, c. 18. Hearings before the department began on

---

[1] Before the department the proceedings were known as D. P. U. 10,349 and D. P. U. 10,564.

February 17, 1953, and ended on July 22, 1953. The new schedules ordered to be filed on September 30, 1953, were designed to increase gross annual intrastate revenues by not more than $4,519,450. The decision of the department expressed belief that this increase would produce a return upon net original cost of the company's property in this Commonwealth of 6.313%. Such return was to be at a rate of 8.5% upon common stock capital and at a rate of 3.64% on debt capital.

On October 13, 1953, the company, without waiving its right to appeal, filed new schedules. Following entry of this appeal, a single justice stayed the orders subject to a repayment bond (see Rule 46 of the Rules for the Regulation of Practice at Common Law and in Equity [1952], 328 Mass. 725), and the rates filed on December 10, 1952, became effective on November 5, 1953.

## The Stipulation, Reservation, and Report.

The case was heard by a single justice upon the petition for appeal and the record on appeal. The latter includes the transcript of testimony and exhibits before the department; and, by stipulation, additional documentary evidence pertinent to the company's operations during the nine months ending September 30, 1953, and modified findings of fact and amended orders made thereon by the department. Such evidence disclosed the effect of actual operations down to the date of the department's decision and tended to show that the earnings for the first nine months of 1953 were at the rate of 5.25%. The amended orders permitted the company to file schedules of rates designed to yield gross revenues of $2,927,350 in excess of those provided in the order of September 30, 1953.

The single justice, at the request of the parties, reserved and reported the case without decision, such decree to be entered as might be appropriate under G. L. (Ter. Ed.) c. 25, § 5, as amended.

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

## ISSUES.

The company contends that the department's orders are confiscatory because (1) they do not permit the company to earn a reasonable return upon the fair value of its property; and because (2) on the prudent investment-cost of capital theory adopted by the department (a) the company will not earn upon its investment the predicted return of 6.313%; (b) the department used a hypothetical debt ratio of 45% instead of the actual ratio of 36.1% in computing overall cost of capital; and (c) the department disallowed as an expense of operation certain amounts actually paid by the company into its pension fund.

## THE DEPARTMENT'S ORIGINAL DECISION.

The department adopted a rate base computed on original cost of plant less accrued depreciation, taking the company's book figures as such, and not merely as evidence of present value,[1] less certain deductions it saw fit to make. In so doing, the department excluded plant under construction, property held for future use, and cash working capital, the last on the ground that tax accruals are more than ample for the purpose.[2] It disallowed one half of the pension freezing payments so called, about which we shall have more to say later.

The average net intrastate investment appearing as the company's book cost has been steadily increasing. Some of the figures are: 1947, $186,882,000; 1951, $247,436,000; 1952, $255,709,000; and May 31, 1953, $267,703,000. The

---

[1] To borrow words of the department's brief: "It refused to toy with reproduction cost or cost indices and looked only to the original cost of the property as it appeared on the books of the utility. To query as to whether or not it was finding a 'value' by this process is a fruitless and unrealistic inquiry into pure semantics."

[2] The company considers that the department erred in excluding these items, but does not ask us to decide these questions. In an appendix to its brief, the company says, "Since these points are relatively unimportant in the decision of this case, we point them out here merely to show that the department eliminated actually existing investment as well as it failed to recognize known future investment."

company's estimates for two of the dates upon which the rates would be in effect were December 31, 1953, $282,385,-000, and December 31, 1954, $305,086,000. The increase from 1947 to 1952 was about 37%. If the estimated figure for the end of 1954 should be attained, the increase from 1947 would be about 63%. The gross construction program of the company in Massachusetts appears from these figures: 1950, $22,157,000; 1951, $26,726,000; 1952, $34,899,000; 1953 (estimated) $41,000,000; and 1954 (estimated) $44,-400,000.

We quote from the decision of the department: "It is essential in order for respondent to be in position to furnish adequate service to the people of Massachusetts that this gigantic construction program be encouraged. In March, 1953, there were 22,154 orders for main station service held by respondent in Massachusetts awaiting facilities. In addition, there were 109,921 orders for regrades so held. . . . [A]lthough the company has been making some progress in reducing the number of held orders and regrades, the new demand is so substantial that it continues to have a very large number of such orders in its files at the end of each year. It is in large measure due to this situation that respondent is committed to such large capital expenditures in the immediate future. . . . The plant so being constructed is relatively expensive. At the end of 1951, the total plant in service per telephone was about $258. During 1952, 52,945 new phones were added, and the gross book cost increased at the rate of $382 per additional telephone. It is, in other words, retiring some relatively low cost plant and adding a great deal more new plant under present day inflated costs." After criticising the company for canceling its expansion plans in 1949 when the rates in effect were those held to be confiscatory in *New England Telephone & Telegraph Co.* v. *Department of Public Utilities*, 327 Mass. 81,[1] the department's decision continues: "[W]e believe in

---

[1] It was there stipulated that the composite return on the rate base resulting from the department's order would be 4.887% if the company was not entitled to earnings on reinvested surplus and 4.768% if the company was so entitled. 327 Mass. 81, 84-85.

331 Mass. 604                                          609

New England Telephone & Telegraph  Co. *v.* Department of Public Utilities.

[it?] our duty to further its present expansion program as best we can for the benefit of the public.  It is necessary, of course, in finding the appropriate rate base, to use one to which it is possible to relate an income statement.  Under the prudent investment rule, which we have followed wherever possible, such figures, as well as the rate of return used in connection therewith should be as nearly contemporary as possible.  However, fair treatment of an earnings statement requires the use of a full year's figures in order to avoid seasonal distortion.  The only earnings statements covering a full year which appear in evidence are those for the year 1952.  We believe, therefore, that the proper rate base to use in these proceedings is the average net plant investment for the year 1952.  We find the proper rate base as of such period to be $250,084,000, computed as follows:

| | |
|---|---:|
| Gross plant in service  .    .    .    . | $384,240,000 |
| Less depreciation reserve  .    .    . | 136,756,000 |
| | |
| Net plant in service  .    .    .    . | $247,484,000 |
| Plus materials and supplies    .    . | 2,779,000 |
| | |
| Average net investment  .    .    . | $250,263,000 |
| Less Charleston Plan correction[1]    . | 179,000 |
| | |
| Rate base  .    .    .    .    .    . | $250,084,000 " |

The department made certain modifications in the earnings as appearing in the books, the more important being to allow a full year's operation to a wage increase given the company's employees effective October 12, 1952, and to a rate increase effective July 24, 1952.  It then computed the 1952 net earnings to be $13,970,000, which would mean a return of 5.59% on the rate base of $250,084,000.  The decision referred to estimates presented by the company

---

[1] Adopted early in 1952 for the separation of that portion of the company's plant applicable solely to intrastate operations.

that the then existing rates would yield net earnings for 1953 of $14,076,000, or 5.17%, on an average net investment of $272,375,000, and for 1954 of $14,747,000, or 5.01%, on an average net investment of $294,440,000. The estimates were dismissed with the statement: "However, the company did not pretend to do more than support its claim to increased rates by its future estimates, and all of the itemized data presented relate to 1952 results."

As to a substantial regulatory lag found to exist in this case, the decision commented: "It is unfortunate that this results, in a period of rising prices, in detriment to the utility and in balance sheet results which are less favorable than contemplated by the regulatory agency. It is to be observed, however, that in a period of falling prices, this process works in reverse, and it is usually some time before even the most diligent regulatory agency can be in a position to demand a corresponding decrease in rates."

The department made certain expense modifications. It increased the figure for taxes by $104,000, and decreased the amount of telephone expenses by $192,000 representing one half of the company's actual payments into its pension fund, so called "pension freezing" payments, which the department found "should have been charged against operations in previous years, and are an improper charge against operations in 1952." The effect of these changes was to bring the net intrastate earnings under the then rates to $14,058,000, a return of 5.62% on the rate base found.

To reflect the 1953 results so far as it had them, which was for five months, the department decreased this earnings figure to $13,755,000, and used the reduced amount for the purpose of computing the increased revenues to which the company was entitled. The decision referred to testimony that the first five months normally would show better results than would the balance of the year, and that the third quarter is usually a poor earning period. These factors, however, were disregarded because of testimony that the "plant being added is of a nature which should tend to

decrease operating costs at a more rapid rate than maintenance increases."[1] Also, because of testimony "regarding the earnings potentialities of the new plant," the department did not accept the company's estimates of earnings beyond 1953.

In the *New England Telephone* case reported in 327 Mass. 81, the debt ratio was 62.1% (see page 91). As a result of security issues the debt ratio at the time of the decision in the present case was 36.1%. On this subject the department declared: "We cannot find that the company's directors were acting capriciously or arbitrarily in establishing the existing corporate structure, or that they were exercising anything except their own best judgment of what is best for respondent, which doubtless is their primary duty as directors. On the other hand, we find that the company can operate without trouble on a 45% debt ratio and that such debt ratio would not entail undue additional interest expense, nor would it interfere with the soundness of its debt or equity securities. We find such ratio to be adequately conservative for this type of utility. It is possible that the higher debt ratio might endanger the present high rating of its bonds, though we doubt it and in any event, we see nothing catastrophic in such an eventuality. We find finally that full recognition of the interest of the rate payers in respondent's capital structure demands that we adopt such debt ratio for the purpose of computing a fair rate of return." The department found the cost of additional debt capital to the company to be 3.90%, and the aggregate current cost of debt capital at a 45% debt ratio to be 3.64%. The decision prophesied that "a return of 8.5% on the company's equity investment will yield it a fair return, and will be more than adequate to insure the attraction of the necessary additional equity funds which it will require." The department concluded that the following overall rate of return will be fair and equitable, will

---

[1] The optimism engendered by this unspecified testimony had not been justified by the time of the supplemental decision. The company contends that it was wholly without reliable foundation in the first place.

maintain the company's credit, and enable it to obtain additional capital when needed to serve its public:

45% debt capital×3.64% net return  =1.638% net return on whole capital
55% stock or equity capital×8.5%
                          net return  =4.675% net return on whole capital

Composite net return on total of both
                 kinds of capital    6.313%

These figures are the same as the minimal nonconfiscatory rates found by us in the previous *New England Telephone* case, 327 Mass. 81, except for the actual cost of debt capital, which there was 3.45%, and, of course, the total, which reflects that difference.[1]  The net return on stock capital is at the exact rate which we found barely not to be confiscatory in the earlier case where we said (page 96): "In our opinion therefore a net return of less than 8.5% on stock capital or less than 6.23% on the sum of both kinds of capital is below the level where confiscation begins.  It does not follow that a considerably higher return might not fall within the range of reason and might not have been allowed by the department, but our duty is performed by marking the line of confiscation."  See *Massachusetts Bonding & Ins. Co.* v. *Commissioner of Insurance*, 329 Mass. 265, 270; *Federal Power Commission* v. *Natural Gas Pipeline Co.* 315 U. S. 575, 585.

## The Department's Supplemental Decision.

The supplemental decision was dated January 6, 1954, and contained these findings.  The company had actively continued its construction program.  Its investment account on September 30, 1953, was $276,648,000, and the average for the nine months ending on that date $269,-564,000.  The rate base found in the earlier decision should be raised to $260,396,000.  For the nine months ending September 30, 1953, revenues were $106,378,000, expense $80,567,000, and net earnings, after taxes and before interest, $10,623,000.  Modified by the rate increase allowed

---

[1] The department carried its computation to the third decimal point, and so its product of 55 times 8.5% is 4.675% instead of 4.68%.

331 Mass. 604    613

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

under the order of September 30, 1953, net earnings would be $12,198,000. However, depriving the company of the credits for interest charged during construction and disallowing one half of the "pension freezing" payments, the earnings for the nine months would "appear" as $12,047,-000, an amount, which, if annualized, would mean a return on a $260,396,000 rate base of 6.17% instead of the 6.313% to which the company was found to be entitled under the previous order. A "very large part of this effect" is due to increased operating costs. If applied to the nine months ending September 30, 1953, the wage increase of October 11, 1953, would raise expense $1,515,000 and decrease net earnings $710,000. The company is entitled to earnings of $16,438,800 after taxes but before interest to achieve a return of 6.313%, but under the rates filed as a result of the order of September 30 is earning only $15,116,000. To increase net earnings by $1,322,800, there must be a gross increase in revenues of $2,927,350.[1] The order, accordingly, allowed increased gross annual revenues of $7,446,800.

The supplemental decision referred to a "disconcerting fact" shown by the comparative earning statements for 1952 and 1953. On September 30, 1952, the company was operating 64.8% of its stations in dial service at a traffic expense, consisting almost entirely of operators' wages, of $23,043,000. On September 30, 1953, dial service covered 66.1% of its stations, and traffic expense had increased to $24,518,000. The department observed: "Some of this increase is doubtless due to a wage increase effective late in 1952, but it is disturbing to find that the conversion to dial service has so little effect upon respondent's operating wages. The natural assumption would be that its traffic expense would decrease and maintenance expense increase in proportion of the percentage of dial stations. . . . [I]t may be that the effect of the dial conversion upon traffic expense

---

[1] Chiefly because of Federal income taxes it takes $2.213 of revenues to net one dollar of earnings. In its decision the department stated that "out of every dollar of gross revenue paid by telephone users in Massachusetts, about 14 cents went to pay taxes" of all kinds.

is not reflected as promptly as might be expected. The facts do, however, . . . further substantiate the conclusion to which we arrived in our previous order that the increase in earnings which we are providing for herein should prove to be substantially higher than is indicated and there is or should be a correspondingly increased margin in net telephone earnings in the future."

## RATE BASE.

The company declares fair value to be the principal issue and makes the contention that arts. 10 and 12 of the Declaration of Rights of the Constitution of this Commonwealth strike down an order of a rate regulating body which denies to a public utility the opportunity to earn a fair return on the value of the property used to render the service. This question, now presented to this court for the first time, expressly was left undecided in *Lowell Gas Co.* v. *Department of Public Utilities*, 324 Mass. 80, 94, 95–96, and *New England Telephone & Telegraph Co.* v. *Department of Public Utilities*, 327 Mass. 81, 88–89.

We note that no point is made under the Constitution of the United States, where the contention seems to be answered in the negative by the majority opinion in *Federal Power Commission* v. *Hope Natural Gas Co.* 320 U. S. 591, 602–603, which is, of course, of only persuasive value as to our State Constitution. See *Opinion of the Justices*, 328 Mass. 679, 685, 686–687.

In *Donham* v. *Public Service Commissioners*, 232 Mass. 309, 313, appears the statement: "The rule established by the public service commissioners for their guidance in fixing rates in an earlier case and apparently intended to be followed by them in others, so far as applicable, is that under the Massachusetts law 'capital honestly and prudently invested must, under normal conditions, be taken as the controlling factor in fixing the basis for computing fair and reasonable rates,' and that 'such rates are to be allowed as will yield a fair return upon such investments.' *Bay State*

*Rate Case*, 4 Mass. P. S. C. Rep. 11, 12."[1]  Later in the opinion it was observed (page 315): "The subject of rate making or rate revision by the Legislature or by public officers established by legislative authority, has not been much discussed in the decisions of this court."  This observation still holds true as to the topic presently under discussion.  From our own reports, so far as we are aware, we need mention only two statements, the first in an advisory opinion, and the second in a self professed dictum citing the first.

In *Opinion of the Justices*, 251 Mass. 569, relating to the constitutionality of a proposed compulsory motor vehicle insurance statute, it was said, at page 610, "A fundamental principle of rate making by public authority is that in general the rate so established must be sufficient to yield a fair return on the reasonable value of the property used or invested for doing the business after paying costs and carrying charges.  Rates not sufficient to yield such return are unjust, unreasonable and confiscatory.  That is the general rule."  There was no citation of authority, and the precise point then under discussion was the need under the Constitution for a provision for judicial review of premiums to be established by the commissioner of insurance.

In *Horton* v. *Attorney General*, 269 Mass. 503, 509, it was stated, "Reliance is placed in this connection on that part of the *Opinion of the Justices*, 251 Mass. 569, found at pages 610, 611.  It there was said in substance that, where rates to be charged for public utility service by private persons or corporations were regulated by public authority, provision must be made for judicial review of the rates so established to the end that they may be reasonable, yield a fair return upon the value of the property employed after paying costs and carrying charges, and that final determination of such rates could not be vested in a public officer as was expressly provided in the proposed bill then under

[1] For an impartial short critique of the Massachusetts so called prudent investment theory down to 1941, see Barnes, "The Economics of Public Utility Regulation," 506–511.

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

consideration. What there was said, with ample citation of authoritative decisions, is now adopted and affirmed. That principle is not pertinent to the cases at bar." It will be noted that the phrase in the advisory opinion, "fair return on the reasonable value of the property used or invested for doing the business," has become "fair return upon the value of the property employed." No great significance should be attributed to the variation, as the guiding influence in both undoubtedly was *Smyth* v. *Ames*, 169 U. S. 466, and succeeding cases in its line.

In this state of the authorities we shall not adopt at this relatively late date a construction of the Constitution of this Commonwealth which compels the use of any particular theory or method or combination of theories or methods for determining a rate base. *Minnesota Rate Cases*, 230 U. S. 352, 434. *Georgia Railway & Power Co.* v. *Railroad Commission of Georgia*, 262 U. S. 625, 629–630. See *New England Telephone & Telegraph Co.* v. *State*, 95 N. H. 353, 357; *New England Telephone & Telegraph Co.* v. *State*, 98 N. H. 211, 219; *Chesapeake & Potomac Telephone Co. of Baltimore City* v. *Public Service Commission*, 201 Md. 170, 181–182. We cannot read in the Declaration of Rights a mandate that either reproduction cost or original cost must be exclusively adopted in the regulation of rates of a public utility. We would not be justified in laying hold of any part of our fundamental law for the purpose of overriding the department merely because a particular approach to rate regulation was not used. It would not be helpful to discuss the opinions of the Supreme Court of the United States,[1] or of courts of last resort in other States, in many of the latter of which the language of some special statute forms the decisive component.

The department, citing the *Hope* case, points out that it

---

[1] In *Federal Power Commission* v. *Hope Natural Gas Co.* 320 U. S. 591, cited by the department in its decision six times, the court divided five to three with a concurring opinion by two justices and separate dissents by three. The prudent investment or original cost theory followed by the department received its impetus in a concurring opinion of Mr. Justice Brandeis in which Mr. Justice Holmes joined. *State* v. *Public Service Commission of Missouri*, 262 U. S. 276, 289.

considered what rate of return was necessary for the company to realize upon the rate base found, in order to maintain financial integrity, attract capital, and compensate investors for the risks assumed. See *New England Telephone & Telegraph Co.* v. *Department of Public Utilities,* 327 Mass. 81, 94; *Bluefield Water Works & Improvement Co.* v. *Public Service Commission of West Virginia,* 262 U. S. 679, 692; *Colorado Interstate Gas Co.* v. *Federal Power Commission,* 324 U. S. 581, 605. Between November 10, 1952, and January 10, 1953, the market price of the stock varied between $108\frac{5}{8}$ and $112\frac{7}{8}$. At the time of the supplemental decision the stock was selling at about 116, which was what one of the company's witnesses testified that the market should be in order to enable the sale of new common stock at par ($100). More recent market quotations naturally are not in the record.

The company declared dividends at the rate of $8 per annum for 1952. Its dividend rate had not been as high as $8 since 1932. It paid $7 in 1940 and 1941, $6.50 in 1936 and 1939, and $6.25 in 1937. Otherwise it had never paid over $6 since 1932. These findings appear in the decision along with a discussion of the company's success in recent new stock offerings.

The "court will not interfere with the exercise of the rate-making power unless confiscation is clearly established." *New England Telephone & Telegraph Co.* v. *Department of Public Utilities,* 327 Mass. 81, 86, quoting from *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, 53.

We are far from saying that the course followed by the department in the present case would meet constitutional requirements in every other. Our holding is that in the present case confiscation is not clearly established.

## DEBT RATIO.

In the previous *New England Telephone* case company revenues were to be determined in a setting where the debt ratio was admittedly too high. As above noted, the debt

ratio was 62.1%, the company advocated reduction to 35%, and the department approved rates after finding that a debt ratio of 45% would be reasonable. In rejecting the contention that the question was exclusively one of management for the company, we said (page 91) that "we are not prepared to say that the refusal of the department to adjust its rates to a reduction in the debt ratio all at once under particularly adverse conditions from the high point of 62.1% to an ideal ratio of 35% or lower and the department's adoption of the figure of 45% were in themselves unlawful or confiscatory."

In the present case the question arises in different form. The debt ratio has been cut by management to 36.1%. With reduction an accomplished fact, the department has, nevertheless, allowed rates as before upon an assumed debt ratio of 45%. The company insists that here is interference with the prerogatives of management. The department, on the other hand, presses the argument that the company acted "in flagrant and contumacious disregard of the expressed opinion of the department." We agree with neither. As a matter of internal management, the company's directors had the right to determine upon the reduction in indebtedness. Indeed, the department's very decision declares that the primary duty of the directors was to exercise their own best judgment of what was best for the company, and intimates by indirection that they did so. The directors did not have to abdicate their own business judgment and to ingest the department's opinion or else be denounced as contumacious. But, as pointed out in the previous case (pages 90–91), debt structure and the percentages of debt and equity capital enter vitally into the determination of the amount which the consuming public should pay. A 35% debt ratio might be deemed in the nature of a company luxury not to be reflected in rates to be charged the public. In any event, the department could think so without our being able to adjudge that there is anything unlawful or confiscatory about its position.

Our conclusion has the support of all court decisions dis-

cussing the subject which have come to our attention. *Chesapeake & Potomac Telephone Co. of Baltimore City* v. *Public Service Commission,* 201 Md. 170, 189–190. *New England Telephone & Telegraph Co.* v. *State,* 98 N. H. 211, 220. *Petitions of New England Telephone & Telegraph Co.* 116 Vt. 480, 502–504. The practice of rate regulating authorities is in accord.

## PENSION FREEZING PAYMENTS.

In 1913 the company established a noncontributory pension plan, which until 1927 was financed on a pay-as-you-go basis, the amounts actually paid out to pensioners being charged to expense without advance funding. The plan is similar to others throughout the Bell system. On October 1, 1927, the financing was put on an accrual basis, the accruals commencing, as a transitional step, at the end of each employee's fifteenth year of service. At the same time the company provided that the amounts accrued should be placed in an irrevocable trust fund with a New York bank as trustee. On January 1, 1929, the company adopted the full service basis of accrual, and thereafter used accrual rates adequate to distribute pension costs as a level percentage of payroll over the full period of employee service. As there naturally were many employees of many years' service, the accruals to the fund did not suffice to meet the full cost of future payments to pensioners. The amount by which accruals plus the fund fail to meet the cost of future pensions is the unfunded actuarial reserve requirement. The fund will be inadequate unless payments are made into it to compensate for the lack of earnings from the unfunded reserve. In 1937 the company took a final step in the development of its accrual program. Since then the fund has been financed upon the modified remaining cost basis. As of April 1, 1937, the company determined the amount of the unfunded actuarial reserve requirement, which was regarded as frozen at that figure. To insure the integrity of the plan, payments, called freezing payments, are made

into the fund equal to the income which the unfunded reserve would earn were it an actual fund available for investment.

The foregoing is, for the most part, a partial summary of the testimony of one Stevenson, an actuary for the company, who was the only witness to testify on this complicated subject. The statements in it, which are needed as a basis for discussion, we believe to be undisputed and to have been assumed in the very short discussion of pension freezing payments in the decision. All that there appears is that in the previous proceedings, which came before us on other questions in 327 Mass. 81, the department disallowed as an expense one half of such payments; that its decision in those proceedings outlined the history of the pension plan; that the department there found that the pension accruals were excusably on an actuarily unsound pay-as-you-go basis from 1913 to 1927, but that there was not the same excuse for failure to prevent an increase in the unfunded actuarial reserve requirement between 1927 and 1940;[1] that the testimony in the present proceedings is practically the same as before; that freezing payments in 1952 amounted to $384,000; and that $192,000 "represents funds which should have been charged against operations in previous years, and are an improper charge against operations in 1952."

The reference to the findings made in the previous proceedings does not make them part of the present record. But a reading of them would confirm our conclusions reached on this record. The department has not indicated any evidence upon which it relied. The disallowed fraction of one half is an obvious arbitrary selection.

Whether there is evidence warranting a finding of the department is a question of law in appeals under G. L. (Ter. Ed.) c. 25, § 5, as amended. *A. B. & C. Motor Transportation Co. Inc.* v. *Department of Public Utilities*, 329 Mass. 719, 722. We shall treat the department's finding as meas-

---

[1] The latter date must be in error for 1937.

331 Mass. 604                                    621

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

uring up to the bolder restatement in its brief, that "the company was inexcusably lax in arriving at its final and sounder conclusion." But there is nothing in Stevenson's testimony, or elsewhere in the evidence that we can discover, to support that finding, or to support a finding that the company foreseeably should have acted earlier, or that, judged by contemporary standards, its conduct was unreasonable, an abuse of discretion, or even only poor judgment. On this record the allowance of only one half of the pension freezing payments as an expense was an error of law and must be modified by allowing the deduction of the full amount.

This identical question has arisen in courts of other States, and has been uniformly decided contrary to the view adopted by the department. *Petitions of New England Telephone & Telegraph Co.* 116 Vt. 480, 488–499. *Pittsburgh* v. *Pennsylvania Public Utility Commission,* 370 Pa. 305, 316–323. *Alabama Public Service Commission* v. *Southern Bell Telephone & Telegraph Co.* 253 Ala. 1, 36–39. *Southern Bell Telephone & Telegraph Co.* v. *Georgia Public Service Commission,* 203 Ga. 832, 847–851, 874–875. *Columbus* v. *Public Utilities Commission of Ohio,* 154 Ohio St. 107, 134–135. *In re Northwestern Bell Telephone Co.* 73 S. D. 370, 391–392. *State* v. *Department of Public Service of Washington,* 19 Wash. (2d) 200, 259.

We are not impressed with the argument of the department that $192,000 is so "insignificant" in comparison with other figures in this case that an error of this amount should be overlooked. If relative smallness of sum has any significant bearing, it seems to us to show that there is no unfairness to consumers in omitting to strip the company of the benefit of one half of this item of expense. The suggestion that the department might have found that the company was entitled to a lower revenue than it did find does not merit lengthy discussion. These rate cases are protracted enough and present questions enough on the facts which the department finds, or which it is the duty of the department to find, without stretching the scope of ap-

peal to embrace consideration of other inconsistent facts which it is argued might have been found but which were not.

### PROBABLE FAILURE TO EARN ALLOWED RATE OF RETURN.

The company complains that 6.313%, the rate to which it has been found to be presently entitled, clearly cannot be earned during the foreseeable effective period of the ordered rates. Recalling its recent unsatisfactory experience in trying to earn rates of return allowed in decisions of the department, it outlines the grievance that for the last three years, instead of the 6.23% purportedly allowed by the department pursuant to our order in the previous case, actual earnings have been but 5.51%, 5.44%, and 5.25%, respectively. The department's decision does not contain these figures, but the main contention is not effectively disputed. Indeed, the brief of the department offers this explanation: "The company's failure to realize the full benefit of the department's past orders is due almost entirely to the familiar detriment suffered by all regulated industries in times of rapidly rising costs." The reference is to "erosion" or "attrition" of the rate of return which was defined in the decision in these words: "This terminology has been used to describe the tendency of the rate of return to diminish in a period of comparatively high construction costs, since new plant is being added which, as we have already found, is relatively expensive per telephone station. As the high cost plant comes into service, it tends to increase the applicable rate base at a more rapid pace than the resultant earnings, and the rate of return decreases accordingly." See "Original Cost Rate Regulation and Inflation," 66 Harv. L. Rev. 1274. The department's brief concedes that the "current inflation was in full swing by 1951," and that "[t]he economic situation today is no different from that which was current in 1951, except in degree." Since the contrary could hardly be asserted, there can be no solace for the company in the statement from the decision quoted earlier in the opinion (page 610) that "in a period of falling

prices, this process works in reverse." With no finding of any prospect of falling prices or no serious suggestion of evidence that might warrant such a finding, these considerations are without weight in dealing with the realities of this case.

The department's decision contains this apt statement: "It is self-evident that the more nearly an order of this nature comes to being based on contemporary data, the more nearly exact justice is done to the utility and the further away is another rate case." Nearly a year has elapsed since the department's original decision and nearly nine months since the supplemental decision. We think that the findings reveal that the company's fears that it will not earn the allowed rate of return are well founded. We are much impressed that, from a consideration of the company's figures for the first nine months' operations in 1953, the department's supplemental decision raised the rate base the equivalent of over a million dollars a month. We are of opinion that if the company's construction program has proceeded as planned, and as revealed in both the decision and the supplementary decision, the rate base must be raised as of a date or dates to reflect a demonstrated substantially increased investment, to the end that the company may conduct its operations with the allowed revenue more nearly based upon contemporary data. Where the regulatory line is drawn close to the border marking the area of confiscation, there is danger that only slight change in economic conditions will cause a drop below the minimum lawful return, as would even a slight miscalculation of the regulatory body. The department, of course, denies that such is this case.[1]

---

[1] The department says in its decision: "We are of the opinion that the rate of return to which we have arrived is far from conservative and represents substantially more than a 'bare bones' cost of capital." The last mentioned term is defined in its brief as "signifying a result in the estimation of which no allowance has been made for a safety factor, and where reasonable doubts have been resolved in the direction of a lower result."

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

## Recommittal.

The occasion seems appropriate to recommit the case to the department to review its findings in accordance with this opinion and in the knowledge of intervening experience. *Lowell Gas Co.* v. *Department of Public Utilities,* 324 Mass. 80, 89. *Opinion of the Justices,* 328 Mass. 679, 690. More is now known of the progress of the construction program, and of company revenues and expenses. A chance is afforded to shorten the period of forecast, and at the same time to observe whether the department or the company has been more nearly correct in estimating the rate of return which would be earned. There will likewise be an opportunity to observe more about labor costs under the dial system. There will be no occasion to rely upon 1952 as a "test year," as stressed by the department and as strongly protested by the company.[1]

Extended hearing should not be necessary. Precedent is found in the stipulated evidence at the hearing before the single justice. Examination of the entries in the company's books of account subsequent to September 30, 1953, should provide all or nearly all that is necessary in the way of additional evidence. In the meantime the stay granted by the single justice subject to refunding bond will stand.

## Order.

In view of the foregoing, it is ordered that the case be recommitted to the department of public utilities to review its findings in accordance with this opinion. The stay granted by the single justice subject to refunding bond will stand.

*So ordered.*

---

[1] Strictly speaking, we should expect a test year to be under proposed rates and not under predecessor rates. See concurring opinion of Mr. Justice Brandeis in *State* v. *Public Service Commission of Missouri,* 262 U. S. 276, 291–292.