584 P.2d 1175

**ARIZONA CORPORATION COMMISSION, Appellant,**

v.

**CITIZENS UTILITIES COMPANY, Appellee.**

**No. 1 CA–CIV 3168.**

Court of Appeals of Arizona, Division 1, Department B.

May 9, 1978.

Rehearing Denied Aug. 31, 1978.

Reviews Denied Oct. 5, 1978.

---

Molloy, Jones, Donahue, Trachta & Childers, P. C. by Michael J. Meehan, Tucson, for appellant.

Evans, Kitchel & Jenckes by Earl H. Carroll, Lex J. Smith, Phoenix, for appellee.

## OPINION

JACOBSON, Judge.

This appeal by the Corporation Commission questions the propriety of a Superior Court's judgment setting aside a previous Commission order setting the fair rate of return allowable to Citizens Utilities on the fair value of the company's properties.

Citizens Utilities Company (Company) is a Delaware corporation with its principal offices in Stamford, Connecticut. The company, either directly or through its subsidiaries, operates various types of utilities throughout the United States. One operating unit of the company located in Kingman, Arizona supplies electrical services to Mohave County, Arizona under the supervision of a district manager.

From a customer and sales standpoint, the major electrical service areas in Mohave County are in Kingman and Lake Havasu City. The other areas of service are primarily resort areas along the Colorado River and in scattered thinly populated mining areas.

The Mohave electrical operation has no generating capacity itself, receiving its electrical supply by purchase from Arizona Public Service under a long-term wholesale contract.

During the test year, which ended on June 30, 1972, 44% of the total kilowatt hours sold were to industrial customers, although these numbered only 17.

On October 13, 1972, the company filed an application with the Commission, requesting it to determine the fair value of its electrical utility properties in Mohave County, to fix a fair rate of return thereon and to establish rate schedules which would provide the revenue to meet the fixed return.

At the hearings before the Commission, a fair value of the properties was established which is not in dispute. The controversy between the parties centers around the determination of the fair rate of return on that fair value. The evidence on this issue before the Commission was supplied primarily by Dr. John K. Langum, testifying for the Commission and Dr. Walter A. Morton testifying for the Company.[1] Both of

1. The hearing at which these experts testified were combined with another rate hearing involving Sun City Water Co. *See, Sun City Water Co. v. Arizona Corporation Commission,*

these gentlemen are nationally known rate of return experts. Basically, Dr. Langum testified that a "minimum" rate of return would be "no less than" 7.15%. Dr. Morton testified that in his opinion a fair rate of return would be 9.75%. The Commission, while basically adopting Dr. Langum's methodology, set a rate of return at 6.75%. In doing so, it concluded: (1) the risks to the Mohave Electric Division operation were less than other utilities because it was in a fast growing area which could be served without expenditures for generation facilities, and (2) because the customers of the Company were primarily residential and small commercial users, they were less likely to be curtailed by energy shortages than other electrical utilities having a large industrial class of services.

The company duly appealed the Commission's setting of the rate of return to the superior court. Basically the same evidence presented to the Commission was presented to the trial court, but in addition, the court allowed, over objection, evidence of conditions occurring after the test year. After the trial *de novo* to the court, it entered a judgment setting aside the Commission's determination of rate of return. The Company then applied to the trial court for an order allowing the Company to set interim rates pending appellate review and redetermination of a proper rate of return by the Commission. Before the trial court could conduct a hearing on this request, the Commission appealed the original judgment setting aside the Commission's order. Over the Commission's objections, the trial court allowed the setting of interim rates upon the Company posting a bond. The Commission has also appealed this order.

On appeal, the Commission has raised three basic issues: (1) whether it was prejudicial error for the trial court to admit evidence of conditions occurring subsequent to the test year; (2) whether the Commis-

sion's determination that 6.75% is a fair rate of return was supported by substantial evidence, and (3) whether the trial court had authority to approve the charging of interim rates by the Company.

■ We had occasion in *Sun City Water Co. v. Arizona Corporation Commission*, 26 Ariz.App. 304, 547 P.2d 1104 vacated in 113 Ariz. 464, 556 P.2d 1126 (1976), to discuss at length the scope of judicial review of rate decisions by the Arizona Corporation Commission. While our opinion was vacated, it was on other grounds, and we therefore conclude that our prior determination that the trial court's review is limited to a determination of whether the Commission's order is supported by substantial evidence and therefore not arbitrary is still valid. *See, Arizona Corporation Commission v. Arizona Public Service Co.*, 113 Ariz. 368, 555 P.2d 326 (1976). In reaching this determination, we are mindful of the admonition of the Supreme Court given in *Sun City*:

"When reviewing a superior court's de novo review of a Commission order this Court will not conduct a separate de novo trial but will uphold the trial court's judgment if it is supported by any reasonable evidence." 113 Ariz. at 465, 556 P.2d at 1127.

We therefore shall attempt to determine whether there is any reasonable evidence to support the trial court's determination that the Commission's decision was not supported by substantial evidence.

In applying this test, we are immediately confronted with the trial court's determination that Dr. Langum's opinion upon which the Commission relied [2] as to fair rate of return was based solely on comparing the rates of return of regulated electrical companies and that such a comparison was not substantial evidence. We reached the same legal conclusion in *Sun City Water Co. v.*

---

26 Ariz.App. 304, 547 P.2d 1104 (1976), Court of Appeals opinion vacated in 113 Ariz. 464, 556 P.2d 1126 (1976).

**2.** As pointed out later in this opinion, the Commission did not accept Dr. Langum's opinion as

to the proper rate of return. It did, however, accept his premise that other electrical utilities were proper comparables.

*Arizona Corporation Commission, supra*,[3] and in doing so reversed the trial court's decision that such comparison evidence was substantial. The 'Supreme Court's vacating of our opinion in *Sun City* and holding that there existed reasonable evidence before the trial court regarding the Commission's rate of return can be interpreted in two ways: (1) that this court was mistaken in its determination that the Commission's decision was based solely upon comparison of rates of regulated utilities of the same class as the applicant, or (2) that such comparison evidence does constitute substantial evidence upon which the Commission's order can be sustained.

If the Supreme Court's decision in *Sun City* was that we were simply mistaken as to the character of the evidence before the Commission, then we merely reiterate what we said in *Sun City*, and would affirm the trial court's judgment in this case as it found as a fact that the Commission did use only regulated electrical companies as comparables.

However, assuming that it is the Supreme Court's holding that comparative earnings of regulated utilities alone constitute substantial evidence, then obviously the trial court in this case was in error and we must search further if its judgment is to be upheld.

In doing so, we reach those issues raised in *Sun City*, but not discussed because of our resolution of that case, but which the company here contends supports the trial court's determination in the case *sub judice*.

Before proceeding upon this task, we deal with the Commission's contention that the trial court improperly admitted evidence of conditions occurring after the test year to reach its determination that the Commission's decision was not supported by substantial evidence. This evidence falls generally into three categories. The first deals with inflationary conditions generally at the time of trial, such as interest rates, changes in financial market conditions, fluctuating prices of common stock, bonds

and utility stocks. It appears that this type of testimony was offered for the purpose of illustrating that in an inflationary period, the 6.75% rate of return set by the Commission was unreasonably low. The second category of post test year evidence dealt primarily with disproving those portions of the Commission's order which justified its rate of return based on the growth risk to Mohave Electric Division, the cost of supplying new customers, and the economic effect of loss of commercial customers.

The third category of post test year evidence was introduced by the Company to impeach Dr. Langum's opinion by showing that certain comparative electric utilities used by him had either merged or had sought and received rate increases subsequent to the time this testimony was presented to the Commission.

Characteristically, from an advocate's standpoint, the Commission urges that all post test year evidence is inadmissible, while the Company takes the exact opposite view. The trial court justified the introduction of post test year evidence on constitutional 14th Amendment, due process grounds, citing *West Ohio Gas Co. v. Public Utilities Commission*, 294 U.S. 79, 55 S.Ct. 324, 79 L.Ed. 773 (1935).

In our opinion, there is no constitutional due process issue presented and the truth of the admissibility of post test year evidence lies somewhere between the extremes advocated by the parties.

■ We start with the basic proposition that the Commission is constitutionally mandated to set fair rates of return on fair value base of public service utilities. Ariz. Const., art. 15, §§ 3, 14. This function cannot be performed by the judiciary and the judicial role is limited, albeit in a trial *de novo* situation, to determining whether the Commission's decision was supported by substantial evidence, was not arbitrary and was not otherwise unlawful. *Simms v. Round Valley Light and Power Co.*, 80 Ariz. 145, 294 P.2d 378 (1956).

**3.** The trial court's formal opinion in this case was issued on May 23, 1975, approximately a

year prior to our decision in *Sun City*, issued on April 6, 1976.

This limited judicial inquiry must of necessity be exercised based upon the conditions as they existed at the time of the promulgation of the order under review. *See, Old Pueblo Transit Co. v. Arizona Corporation Commission*, 84 Ariz. 389, 329 P.2d 1108 (1958). This may, at the administrative level, require the Commission to consider post test year evidence on due process grounds.[4] *West Ohio Gas Co. v. Public Utilities Commission, supra.* However, limiting judicial review to the same period of time as considered by the Commission, does not involve due process consideration. *United States v. Pierce Auto Freight Lines, Inc.*, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946).

From this discussion, it is apparent that if the Company introduced evidence of the inflationary conditions in the county in 1976, in order to defeat an order of the Commission entered in 1973, the court would be usurping the role of the Commission in setting rates. As was stated in *Lone Star Gas Co. v. State*, 137 Tex. 279, 153 S.W.2d 681 (1941):

"If the Gas Company wishes to contest [a rate] order on the ground that it has become invalid since it was promulgated, on account of changed conditions, it must first invoke the jurisdiction of the Commission to pass on that question. *Gulf Land Co. et al. v. Atlantic Refining Co. et al.*, 134 Tex. 59, 131 S.W.2d 73. In the case just cited we held that the district court could not determine a material controverted fact question which was not passed on by the Commission, in order to sustain a Commission order. This being true, it ought not to be permissible for a district court to annul a Commission order on a ground not even presented to the Commission for its decision." Id. at 312, 153 S.W.2d at 699.

We therefore hold that, insofar as the trial court admitted evidence for the purpose of showing that the basic rate of 6.75% was invalid because of inflationary trends occurring after the fixing of that rate, such admission was erroneous.

However, we do not hold that all post hearing evidence is per se inadmissible. Where the Commission order itself purports to establish facts in the future, it would appear evidence that these prognostications were either valid or invalid would be admissible. *See, Lone Star Gas Co. v. State, supra.* Falling in this category are conclusions by the Commission that the future growth of the area lessened the risk to investors; and the conclusion by the Commission that future curtailments of energy would not affect the Company because of its high rate of residential to commercial customers. In our opinion, when the Commission itself, in defense of its rate making, enters the misty area of prognostication, it must be prepared to accept what the sunshine of experience reveals as to the validity of those forecasts. We find no error in the trial court's admission of post test year or post commission date of hearing evidence in this area.

Finally, we hold that it is a discretionary function of the trial court to determine the admissibility of evidence seeking to impeach expert witnesses based upon happenings occurring after the date of the expert's testimony before the Commission. *See, Burgbacher v. Mellor*, 112 Ariz. 481, 543 P.2d 1110 (1975); *cf. City of Tucson v. LaForge*, 8 Ariz.App. 413, 446 P.2d 692 (1968). If the same area of impeachment was attempted before the Commission, that is, the financial health of the comparatives, it would not appear to be an abuse of discretion by the trial court to admit similar evidence, although it is of the "I told you so" variety. We find no abuse of discretion by the trial court in this area.

Having found error in the admission of a portion of the evidence accepted by the trial court, the Company urges that such error is not prejudicial for there exist separate and independent bases for holding that the Commission's order is not supported by substantial evidence. Being under a constitu-

4. The record shows that the Commission apparently considered evidence up to the time of its hearing in May, 1973, although the test year was stipulated to end on June 30, 1972.

tional edict to reverse only for prejudicial error, we embark upon that consideration. Ariz.Const., art. 6, § 27.

The Company urges the following contentions which it argues support the trial court's determination that the Commission's order is without substantive support:

(1) That the Commission's reliance upon Dr. Langum's "not less than" or "minimum" rate of return of 7.15% is not legally permissible;

(2) That Dr. Langum's opinion as to a fair rate of return is based upon an unconstitutional premise for a "fair value" jurisdiction;

(3) That Dr. Langum's theory of readjusting the capital structures of comparative companies was improper, and

(4) That the absence of risk involved for Mohave Electric is not supported by substantial evidence.

Dr. Langum testified that in his opinion, a rate of return of 7.15% was "the absolute lowest that could be justified and still have anyone consider it as even a minimum fair rate of return." He further testified that a "middle of the range" fair rate of return would be at least 7.33% or in the range of 7.15% to 7.50%, or a possible high of 7.65%. Dr. Langum chose the 7.15% figure because of what he thought was the effect of the Federal Price Board Regulations. These regulations, if meaningful, expired in August, 1973.

The Company contends that Dr. Langum's "minimum" opinion is not legally acceptable and that the Commission's use of that opinion to arrive at its own conclusion was likewise legally unacceptable. The Commission argues that while it accepted Dr. Langum's methodology, it rejected his conclusion as to a proper rate, and therefore any error was irrelevant.

First, we agree with the Company's contention that Dr. Langum's "not less than" opinion if accepted by the Commission, would not legally support a "fair rate of return" finding because it is itself not substantial evidence but is speculative. *City of Tucson v. Citizens Utilities Water Co.*, 17 Ariz.App. 477, 498 P.2d 551 (1972).

However, we likewise agree with the Commission that its determination that 6.75% was a fair rate of return was not premised upon Dr. Langum's "not less than" opinion. Rather, a fair reading of the Commission's decision is that this rate of return was arrived at by an independent judgment of the Commission. For that reason, Dr. Langum's "minimum" opinion was irrelevant.

Likewise, we also reject, on the grounds of relevancy, the Company's contention that Dr. Langum's opinion, being based upon the amount of the finding as to fair value base, was unconstitutional.[5]

What the Commission did do, however, was to accept Dr. Langum's premise that in order to arrive at comparative earnings between companies, it was necessary to adjust the comparative company's debt/common equity ratio to that of the applicant company.

This was done in the following manner. The debt/equity ratio of the Company is 42.6% debt and 57.4% equity. The average equity ratio of the 30 electric utilities selected by Dr. Langum was approximately 35%. It was Dr. Langum's opinion that the rate of return on common equity for comparison purposes between two businesses, although identical, can only be made if their common equity ratios are the same or similar. Likewise, it was his opinion that if the capital structures of the comparable companies were dissimilar, adjustments must be

---

5. Under our constitution, a utility is entitled to a fair rate of return on the fair value of its properties, "no more and no less." *Arizona Corporation Commission v. Ariz. Water,* 85 Ariz. 198, 335 P.2d 412 (1959). Dr. Langum violated this principle by pegging his opinion as to rate of return to the finding of fair value.

This results in a fluctuating rate of return. Thus, under Dr. Langum's theory, it makes no difference whether the Commission used original cost or reproduction cost as the base, the amount of dollars in the Company's coffers is basically the same.

made so as to properly reflect the equity ratio on rate of return.

In order to accomplish this comparison, Dr. Langum took the stated rate of return for the comparable companies and recomputed that rate of return as if the comparable company had an equity ratio of 57.4%. The result was that all of the comparable companies' stated rate of return on common equity was reduced.[6] Thus, under Dr. Langum's theory, although the 30 electrical utilities used as a comparison had an average stated rate of return on common equity of 13.58%, adjusting that common equity to 57.4% resulted in an average rate of return of 10.48% of common equity. The Commission utilized these figures to justify its rate of return of 6.75%, which implied to the Company a 9.25% return on book common equity.

The Company objects to this procedure for two reasons: (1) that there is no economic or legal authority for such reprising, and (2) that Dr. Langum's actual computations on reprising treat the historical interest rates on debt as the readjusted cost of equity capital which is improper.

We agree on both points. The Commission properly points to several cases, as well as treatises, which support the proposition that the capital structure of a company has a relationship to the actual rate of return on common equity. As is pointed out in Nichols, Ruling Principles of Utility Regulation—Rate of Return, Ch. 14, § 1 at 264:

> "Debt ratio is said to be an important factor which must necessarily be considered in fixing rates, since it substantially affects the manner and costs of obtaining new capital. Involved in the finding of a just rate of return is the effect of the different securities in the capital structure, since, by economic principles and experience, income yield lessens with increasing security of capital."

This may well be true where the "cost of capital" method is utilized to determine fair rate of return. This method requires a determination of the amount of monies necessary to pay the actual interest obligations as they accrue on existing debt capital and new debt capital and as to equity capital ". . . the amount which the company would have to pay in order to 'hire' its equity capital under current conditions . . . ." New England Tel. & Tel. Co. v. Department of Public Utilities, 327 Mass. 81, 88, 97 N.E.2d 509, 513 (1951).

Historically, because senior debt security has less risk than equity security, it has a lesser rate of interest. Therefore, regulatory commissions have traditionally looked at the capital structure of an applicant company when that company seeks a rate increase in order to attract new capital, to determine whether the debt ratio should not be increased (at a lower rate of interest) rather than an increase in equity (at a higher rate of interest.) Thus, a lower debt ratio with a correspondingly higher equity ratio (at an added cost) may well be a ". . . luxury not to be reflected in rates to be charged the public." New England Tel. & Tel. Co. v. Department of Public Utilities, 331 Mass. 604, 618, 121 N.E.2d 896, 904 (1954).

To avoid this "luxury" some regulatory commissions have imposed upon applicants a hypothetical capital structure in order to obtain a "fair" rate of return. See, New England Tel. & Tel. Co. v. State, 104 N.H. 229, 183 A.2d 237 (1962); In re New England Tel. & Tel. Co., 116 Vt. 480, 80 A.2d 671 (1951). We do not determine whether such a hypothetical rate structure method would pass muster in Arizona. However, it is one thing to create a hypothetical capital structure for the applicant in order to avoid what is seen as an imposition on consum-

---

6. This may be illustrated by the following example. If two companies have equal capital structures of $1,000, Company A having no debt, and Company B having 66⅔% debt, and if each company makes $80, Company A having 100% common equity ratio would have an 8% return on common equity, while Company B, having only 33.3% common equity ratio, would have a return on that equity of 14%. Thus, the lower the common equity ratio, the higher the rate of return on that equity, dollars available remaining the same (sometimes referred to as "leverage.")

ers[7] and quite another to create hypothetical capital structures for comparison companies in order to compare rates of return. None of the cases or treatises cited by the Commission supports such a procedure.

Moreover, if Dr. Langum's basic theory is valid, then the rationale underlying it must be applied consistently, that is, the difference in the rates of debt interest and equity interest must be reflected in the new computations. This was not done. Dr. Langum, in re-evaluating the comparison companies, simply re-computed equity interest at the same rate as debt interest. The result is not only a hypothetical rate of return for the comparison companies, it is also inconsistent with its underlying hypothesis.

■ We therefore hold, that if the Commission is allowed to look at only electrical utilities for comparison purposes in determining rates of return, then the comparable "rate of return" used by the Commission in this case was not "substantial evidence" upon which to base a rate of return for the Company. It therefore follows that the trial court correctly set aside the Commission's order.[8]

■ We have also reviewed the evidence upon which the trial court concluded that the Commission's determinations as to the risks involved in the Company's operation in Mohave County were not real, and find that the evidence supports the trial court's conclusions.

■ Finally, the Commission urges that the trial court lacked jurisdiction to set interim rates. In doing so, it makes three basic contentions: (1) that under A.R.S. § 40–254(F),[9] the Commission order must remain in effect until appellate review is complete; (2) that *Arizona Corporation Commission v. Mountain States Tel. & Tel. Co.*, 71 Ariz. 404, 228 P.2d 749 (1951)[10] if construed as granting to trial courts the jurisdiction to approve the setting of rates is erroneous and should be overruled and (3) that the perfection of the Commission's appeal ousted the trial court of jurisdiction to allow the setting of interim rates.

In arguing that A.R.S. § 40–254(F) prohibits the court from acting on interim rates until appellate review is completed, the Commission relies on *Whitfield Transportation, Inc. v. Brooks,* 81 Ariz. 136, 302 P.2d 526 (1956). In our opinion, *Whitfield* does not have the effect urged by the Commission. What *Whitfield* did determine was that once appellate jurisdiction had attached to a Commission proceeding, the Commission itself was without authority to proceed upon the same subject so as to the oust the Supreme Court of jurisdiction. In reaching this conclusion, the Supreme Court distinguished the *Mountain States* case. Moreover, in our opinion, *Mountain States* is direct authority to authorize the *company* to set interim rates upon the posting of an appropriate bond. This was the procedure followed in this case.

As to the Commission's argument that *Mountain States* is wrong and should be overruled, that argument must be addressed by the Supreme Court, as this court has no authority to overrule Supreme Court decisions. *McKay v. Industrial Commission,* 103 Ariz. 191, 438 P.2d 757 (1968).

7. There is some disagreement among economists as to whether capital structure has any effect on cost of capital. Some contend there is no such effect. *See,* F. Modigliani and M. H. Miller, "The Cost of Capital, Corporation Finance and the Theory of Investment," XLVIII The American Economic Review 261 (June, 1958).

8. The Company also contends that Dr. Langum improperly further adjusted the comparable companies' rates of return by excluding "allowances for funds used during construction from earnings on equity." We do not reach the propriety of this adjustment.

9. A.R.S. § 40–254(F) provides in part: ". . . the rules, regulations, orders or decrees fixed by the commission shall remain in force pending the decision of the courts."

10. In *Mountain States,* the Supreme Court approved an order of a trial court allowing a utility to set interim rates upon posting of a bond.

Finally, the setting of an appropriate bond in this case by the trial court, after an appeal had been effected, falls within the trial court's jurisdiction as delineated in *Castillo v. Industrial Commission,* 21 Ariz. App. 465, 520 P.2d 1142 (1974). In *Castillo,* we stated:

"A review of the above-mentioned 'exceptions' to the general principle divesting the trial court of jurisdiction in the event of an appeal reveals that in actuality they are not exceptions, but are well-reasoned applications of the rationale which led to the formulation and adoption *by the courts* of the general principle in the first instance. This rationale is succinctly stated in *Whitfield Transportation v. Brooks, supra,* as follows:

"'The jurisdiction of this court when properly invoked must be protected. It cannot be defeated or usurped to the extent that its decision when rendered be nugatory. 81 Ariz. at 141, 302 P.2d at 529.'

"By allowing the trial court to proceed with issues not directly involved in, or the subject matter of the appeal, the jurisdiction of the appellate court is adequately protected, and at the same time the trial court proceedings are not inordinately delayed pending the appellate decision." 21 Ariz.App. at 468–469, 520 P.2d at 1145–1146.

The corollary proceedings conducted by the trial court in this case, in setting a bond and authorizing the Company to set interim rates, were issues "not directly involved in or the subject matter of the appeal," and therefore was a proper exercise of the trial court's jurisdiction.

For the foregoing reasons, the judgment of the trial court is affirmed.

WREN, P. J., and EUBANK, J., concur.